[No. S026408. Aug. 12, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANKLIN LYNCH, Defendant and Appellant.

698

## COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Jay Colangelo and Denise Kendall, Assistant State Public Defenders, Ellen J. Eggers and Alison Bernstein, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Ronald S. Matthias and Gerald A. Engler, Assistant Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Defendant Franklin Lynch was convicted of the first degree murders of Pearl Larson, Adeline Figuerido, and Anna Constantin; the residential burglary of Larson, Figuerido, Constantin, Bessie Herrick, and Ruth Durham; and robbery of Figuerido, Constantin, Herrick, and Durham.

(Pen. Code, §§ 187, subd. (a), 189, 211, 459.)[1] The jury also found true the special circumstance allegations of burglary murder and robbery murder as to all three murder victims, the multiple-murder special-circumstance allegation, and allegations that defendant personally inflicted great bodily injury on Herrick and Durham, who were persons 60 years of age or older. (§ 190.2, subd. (a)(3), (17); former §§ 1203.075, 1203.09, subd. (a), 12022.7.) The jury returned a death verdict, and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) For the reasons that follow, we affirm the judgment.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. Prosecution evidence

Between the months of June and August 1987,[2] defendant beat and robbed, or attempted to rob, five elderly Caucasian women in their homes. Three of the victims died as a result of the attacks.

##### (a) Death of Pearl Larson

Late in the evening on June 24, 76-year-old Pearl Larson was found dead in her home. She had lived in a corner house on Wake Avenue in San Leandro with her teenage grandson. Larson was found lying on a bed, with the card holder portion of a wallet and some coins next to her. Her hands were bound with nylon stockings. Her housecoat was pulled up over her head, and she was not wearing underwear. Subsequent investigation revealed no evidence of a sexual assault. An autopsy revealed Larson died by asphyxia caused by a garment that was tied around her head, covering her face and part of her neck. There was bruising on her face, particularly around her left eye, caused by blunt trauma. She had a contusion on the back of her head that "went deeply into the skin of the scalp down to the bone." The skin on her left ring finger was significantly abraded and bruised around the area of her ring.

Earlier that day, between 11:30 and 11:45 a.m., Jolevia Jones, Larson's gardener, and his cousin had arrived to work at Larson's house. Jones, who was approximately 80 years old, spoke with Larson for a few minutes.

About 11:00 a.m. on June 24, Jacqueline Brown, who lived across the street from Larson, observed Larson's grandson leave on a skateboard. At

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] All dates in the discussion of the guilt phase evidence are in 1987 unless otherwise indicated.

11:20 a.m., she saw a man, whom she later identified as defendant, standing in Larson's yard. Defendant walked along the side of the house, went to some bushes and appeared to be urinating, and carefully looked around. He then walked to the front of the house and Brown lost sight of him. Around noon, Brown saw defendant jump over the bushes, which were about five feet high, and run away. Larson typically parked her car under a tree each summer morning to get it out of the sun. Between 7:30 and 8:00 p.m. on June 24, Brown observed Larson's vehicle still parked under the tree.

Bettie Agliano, a friend of Larson's, had plans to meet with her on June 24. Agliano called Larson at home at 12:15 p.m., and at various times during the rest of the afternoon, but no one answered the telephone.

### (b) *Death of Adeline Figuerido*

On July 28, 89-year-old Adeline Figuerido was killed in her home. She lived on 143d Avenue in San Leandro with her two daughters, Marie and Olivia Figuerido. Her house was separated from the next building on the left by an undeveloped half-acre lot and Bay Area Rapid Transit tracks.

Marie and Olivia made lunch for their mother around noon each day. On July 28, they left her at the house around 10:30 a.m. and returned around 11:45 a.m. to discover their mother's body in the dining room. She was covered with a bedspread and her hands were tied behind her back with an electrical cord. A different bedspread was wrapped around her head. The house had been ransacked, and fine jewelry and cash were missing.

An autopsy revealed numerous blunt trauma injuries to Figuerido's face, head, and neck. The bones in her face near and around her right eye, and her mandible on the left side, were fractured. There was extensive hemorrhaging in the neck area, indicating sufficient force was applied to stop circulation to the brain and to interfere with her breathing. She died from blunt trauma to the head and neck.

Between about 11:15 and 11:30 a.m. on July 28, Jan Morris, who worked across the street from the Figuerido residence, saw a man whom she later identified as defendant standing on the Figueridos' driveway. Defendant walked down the driveway toward the front of the house, looked in both directions, turned around, and walked rapidly to the back of the house.

On July 27, the day before Figuerido's murder, between 11:00 and 11:30 a.m., Irma Casteel observed a man whom she later identified as defendant walk to the end of the dead-end street, stand there, and then turn around and walk back. There were two corner houses at the end of the street, one of

which was occupied by an 89-year-old woman, and the other by a similarly aged couple. Casteel lived about one block from the Figuerido residence.

### (c) *Death of Anna Constantin*

On August 13, 73-year-old Anna Constantin was attacked in her home. Constantin lived with her daughter, Vickie Constantin, in a home at the corner of Blossom Way and Bancroft Avenue in San Leandro. When Vickie arrived home from work that evening about 5:45 p.m., she discovered her mother had been beaten so severely she was almost unrecognizable. Some rooms were "messier" than others, items were out of place, and the back screen door had been cut. A gold bracelet, gold chains, and cash were missing from the home.

Constantin was taken to Eden Hospital. Her treating physician, Dr. Chuc Van Dang, testified that her face was swollen and bruised, and she had bruises on her shoulders, back, and other parts of her body. Her left maxilla, or cheekbone, and a right rib were fractured. These facial injuries and bruising were caused by blunt trauma. In addition, Constantin had an open scalp wound two inches long that extended down to the skull. The wound became infected and grew larger over time, so that eventually Constantin's skull was visible. Dr. Dang saw Constantin about 6:00 p.m. on August 13, and opined that her injuries had been inflicted "very recent[ly]," and no more than six hours before 6:00 p.m.

Adele Manos, who had been driving down Bancroft Avenue around 3:15 or 3:20 p.m. that day, saw a man, whom she later identified as defendant, come out from the hedges about a block from the intersection of Bancroft and Blossom, and look around. The man walked down Bancroft toward Blossom.

Around 5:00 p.m., defendant sold a bracelet identified as belonging to Vickie Constantin to a secondhand dealer. A few days later, he gave Mackie Williams, an acquaintance, two necklaces that were also identified as belonging to Vickie Constantin.

Anna died on September 28 of pulmonary emboli due to deep leg vein thromboses or blood clots. Constantin's thromboses were the result of treatment for and complications from her August 13 injuries.

### (d) *Attack on Ruth Durham*

Eighty-eight-year-old Ruth Durham lived alone on Alden Road in Hayward. Her daughter and son-in-law lived next door in a corner house at the intersection of Alden Road and Boston Road. In the late afternoon of August 15,

Durham left her daughter's house and returned home. She sat down in a chair in her living room, and shortly thereafter was struck on both sides of her face. She remembered nothing further about the attack. About 5:30 p.m., after being alerted by a neighbor, Durham's son-in-law discovered her sitting bloody and beaten on the steps of her front porch. She was taken to Eden Hospital. Dr. Kenneth Miller, an emergency room physician at the hospital, testified Durham had massive swelling deformities of her face. Both sides of her jaw and her right maxilla were fractured. Miller opined that Durham's injuries were the result of blunt trauma. After leaving the hospital, Durham needed to live with her daughter because she was no longer capable of caring for herself.

The screen on Durham's back door had been torn just above the handle. Her house was ransacked, and cash and personal belongings were missing. A man later identified as defendant had been seen by neighbors at the intersection of Alden and Boston Roads across the street from Durham's house at about 4:30 p.m. on the day of the attack.

### (e) *Attack on Bessie Herrick*

Around 3:30 p.m. on August 17, 74-year-old Bessie Herrick and her husband, Frank Herrick, returned to their home at the corner of Royal and Bartlett Avenues in Hayward. About 10 to 15 minutes later, Frank went outside to water the garden. While engaged in this activity, he observed a man, whom he later identified as defendant, jogging on Royal Avenue. Five minutes later, Frank returned to the house, peered inside through a window, and saw defendant hitting his wife, who was lying on the floor near the fireplace. Frank entered the house through the garage, but defendant had fled. Bessie's purse was on the floor, and her wallet was outside the purse. An emerald ring kept in a dish in the room was missing.

Bessie was taken to Eden Hospital. Her treating physician, Dr. Edwin Whitman, testified that her nose was broken, her face was swollen, and she had puncture wounds around the left eye. Her orbit and maxilla bones near her left eye were also fractured. She had suffered blunt trauma around the head and neck, and had lost nearly half a pint of blood. She identified defendant as her attacker.

Eric Hoak, an acquaintance and neighbor of the Herricks', was a passenger in a vehicle driving on Royal Avenue around 3:00 p.m. that day and observed a man, whom he later identified as defendant, standing on the Herricks' front porch. The man was looking around as if he were nervous.

John Wulf testified that he was driving down Bartlett Avenue toward Royal Avenue around 4:30 p.m. and saw a man, whom he later identified as

defendant, run at an angle across the street about 50 feet in front of Wulf's car. The jogger ran from the side of the street on which the Herricks' home was located to the other side of the street, looking back over his shoulder toward the house. Wulf proceeded to his destination near the house, and shortly thereafter observed police activity at the house.

(f) *Other evidence*

Lavinia Harvey, who was in her early 80's, lived in a corner house on Medford Avenue in Hayward. Around 3:00 p.m. on August 12, while her husband was away from home, Harvey noticed someone walking beneath their window. Harvey grabbed an iron rod, went outside, and confronted a man she later identified as defendant. She asked defendant what he wanted, and defendant asked, "Was there a Black kid come out this garden?" Harvey said no, gave defendant permission to check a different location in the yard while she observed him, and then instructed him to leave. Defendant did so, and Harvey reported the incident to police that day.

Defendant was apprehended in Los Angeles in October 1987. In a statement to police, defendant denied involvement in these crimes. He admitted selling Constantin's bracelet, but claimed he had obtained it in a drug deal. Defendant said he fled in August 1987 after he read in the paper that he had been connected to the theft of the bracelet.[3] He was concerned about going to jail and thought the police were trying to kill him.

2. *Defense evidence*

Kurt Foell, a gemologist-appraiser, testified that the gold bracelet, identified as belonging to Vickie Constantin, was a man's bracelet mass produced in Russia after 1945.[4]

Barbara Sullivan testified that around 4:30 p.m. on August 15, the day Ruth Durham was attacked, Sullivan saw an approximately 19-year-old Black man, wearing a red plaid flannel shirt and brown work boots, walking down the street on which Durham lived. Sullivan was unable to identify the individual she saw on the street in either a photo array containing defendant's photograph, or a physical lineup including defendant.

Thomas Ivory testified that on July 28, the date of Figuerido's murder, he saw a Black male walking on 143d Avenue away from Figuerido's house

---

[3] On August 19, the police released, and the media broadcast for the first time, a photograph of defendant.

[4] At the time of Anna Constantin's assault, Vickie Constantin told police that the stolen bracelet was about 200 years old.

about 11:45 a.m. The man tossed an object like a rock or a bottle cap as he walked. Ivory was unable to identify the man he saw in a photographic lineup or in a physical lineup including defendant.

Detective Robert Dekas of the San Leandro Police Department testified that on August 19 he and Officer Jouvanicot searched the area where Ivory said he saw an object tossed. They found a fingernail file, rocks, and bottle caps. Jouvanicot took the file for laboratory testing.

Defendant also introduced evidence of inconsistent statements by victim Bessie Herrick regarding the circumstances under which she first encountered defendant. The parties stipulated to dates between June 1987 and June 1988 on which descriptions of the suspect in the crimes, or photographs or likenesses of the suspect or defendant, appeared in the Hayward Daily Review newspaper.

Sergeant Kitchen of the San Leandro Police Department testified that after the murders of Larson and Figuerido, a description of the suspected killer was disseminated. Kitchen also testified that on July 29, Lieutenant Hull of the San Leandro Police Department held a press conference to provide information regarding these murder cases and descriptions of any suspect.

Dr. Elizabeth Loftus testified as an expert on eyewitness identification regarding certain general limitations on the accuracy of such identification.

### B. *Penalty Phase*

#### 1. *Prosecution evidence*

The prosecution introduced evidence that defendant had been convicted of burglary in 1973 and robbery in 1982. It also introduced evidence of the circumstances of the robbery. On January 18, 1982, about 10:00 a.m., Palo Alto police responded to a woman's cries for help coming from a residence located on Palo Alto Avenue. Police Agent Jack Schindler noticed a man, whom he later identified as defendant, inside the house, and told him to open the door. Defendant refused, and broke a window to escape. After a chase, he was arrested. A glove and a woman's ring were found in his pocket. A second glove and a "watchcap-type hat" were found on the chase route. The victim was Rose Nimitz, an approximately 70-year-old Caucasian woman. She was not wearing a ring, and had a cut or abrasion and swelling on her left ring finger. The ring found on defendant was later returned to her.

The prosecution also introduced evidence of defendant's misconduct in jail. On June 26, 1988, defendant had two visitors, a woman and a child. At

the conclusion of the 15-minute visiting period, Alameda County Deputy Sheriffs Stephen Chiabotti and Herb Walters told defendant his time was up. Defendant continued speaking with his visitors. Chiabotti attempted to handcuff defendant for the walk back to his cell. Defendant told Chiabotti not to handcuff him in front of his child. When Chiabotti persisted in attempting to handcuff defendant, defendant pushed Chiabotti in the chest, moving him backward several feet. Chiabotti and Walters struggled with defendant for two or three minutes before subduing him. Following the incident, defendant told Walters, "You guys fucked up. You should have killed me when you had a chance."

Three days later, on June 29, 1988, Deputy Chiabotti and another officer removed defendant from his cell, apparently in preparation for a court appearance. Defendant, who was not handcuffed, was carrying an accordion file. He threw the file on the ground and punched Chiabotti several times in the face, knocking him into a wall.

In addition, the prosecution introduced evidence of the unadjudicated murder of Agnes George. George, a Caucasian female in her late 70's, was found dead in her Richmond home around noon on October 15, 1987. She was covered with a blanket, and her hands and feet were tied with electrical cord and rope. She had suffered blunt trauma, including a broken jaw and cheekbones, and her death resulted from traumatic head and neck injuries. Her home had been ransacked, and a box in which she kept cash was empty.

On October 7, 1987, about 1:00 p.m., a neighbor had observed a man she later identified as defendant walking very slowly down the street on which George lived, and "looking all around the neighborhood." On October 15, between 8:30 and 9:00 a.m., Darlene Fleming, who lived across the street from George and was a close friend, heard George's front door shut. About 9:50 a.m., Fleming saw a man she later identified as defendant standing next to George's house.

The prosecution also introduced evidence of an unadjudicated battery on San Jose Police Officer Michael Rabourn. Between 6:30 and 6:45 p.m. on January 4, 1983, Rabourn, who was in uniform, observed a man he later identified as defendant walking across several front lawns. Rabourn approached defendant and asked for identification. Defendant backed away and Rabourn took hold of his arm. Defendant struck Rabourn in the face, knocking him off balance. Defendant ran and, after a brief chase and struggle, was arrested.

### 2. *Defense evidence*

Defendant presented several character witnesses. Irish Shepherd testified that she and her husband were involved with a gospel singing group in the

1970's. Defendant was a member of the group from 1974 to 1976, was faithful in attending rehearsals and performances, and sang a solo on their record album.

Billie Rachal testified that she met defendant, who was acquainted with her son, when both boys were teenagers. In 1977, when defendant was 21 years old, Rachal's husband died. She experienced financial difficulty, and defendant gave her $100 as a gift. In 1987, defendant stopped Rachal as she got out of her car, and asked to borrow $10. She said she did not have the money. Defendant offered to carry in her groceries, but she declined the offer.

Defendant's mother, father, and brother testified. Defendant was born on July 21, 1955, and had an older brother, who was a program analyst with the Internal Revenue Service as well as a minister, and a younger sister. Defendant's parents had been married for about 39 years. His father had been a supervisor in a machine shop in Oakland before retiring. Defendant attended church regularly while growing up and was well cared for. Defendant moved out when he was about 17 years old, got married, and had six children. His parents asked the jury to spare his life.

## II. Discussion

### A. Pretrial Issues

#### 1. Asserted absence of counsel at lineup

Defendant contends that he was deprived of his own counsel at the live lineup in violation of the Sixth and Fourteenth Amendments to the federal Constitution, and therefore all evidence obtained as a result of the lineup should have been suppressed. We disagree.

##### (a) Factual background

On January 22, 1988, defendant filed a motion to suppress evidence obtained in the November 4, 1987, lineup. The municipal court held an evidentiary hearing on the motion.

After a complaint against defendant had been filed, and at the time the November 4 lineup was scheduled, defendant was represented by the Office of the Alameda County Public Defender. On November 2, however, the public defender announced an intention to file, and on November 3 filed, a declaration of conflict of interest. Also on November 3, the supervising public defender filed a letter requesting that the court appoint two counsel—because of the large number of witnesses expected at the lineup—for the limited

purpose of attending the lineup. Assistant Public Defender Allan Hymer, who had been assigned to defendant's case, contacted the jail to leave a message for defendant that he would no longer be representing him, but he anticipated another attorney would be appointed.

Thomas Surh, who administered the local bar association's court-appointed attorneys program, testified that the municipal court called his office on November 2 to notify it of the public defender's conflict, and then again on November 3 to request two attorneys for the lineup. Valerie West and Joseph Stephens were appointed for this purpose. Subsequently, on November 6, Michael Ciraolo was appointed to represent defendant.

Stephens and West met with defendant shortly before the lineup on November 4, and informed him that the public defender's office no longer represented him. Stephens testified that his role was to "see that the lineup was conducted in a fair fashion." West testified that had she observed irregularities in the lineup she would have noted them in her report. Both attorneys said that in their view they did not represent defendant.[5] The lineup was videotaped, and the videotape was reviewed by the municipal court.

The court denied the motion to suppress, finding that the lineup was not suggestive or unfair, and there was no violation of defendant's Sixth and Fourteenth Amendment rights. Defendant later unsuccessfully filed in superior court a motion to dismiss the information under section 995 because of his asserted lack of counsel at the lineup, and a motion to suppress any identification evidence from the lineup at trial. Both motions relied on the testimony adduced in the municipal court evidentiary hearing.

(b) *Analysis*

■ A defendant has a right to counsel at a lineup conducted after the adversary judicial process has commenced. (*United States v. Wade* (1967) 388 U.S. 218, 236–237 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; see *Montejo v. Louisiana* (2009) 556 U.S. ___, ___ [173 L.Ed.2d 955, 129 S.Ct. 2079, 2085].) In *Wade*, the high court observed that in the absence of counsel, an accused lacks the ability to effectively "reconstruct at trial any unfairness that occurred at the lineup," and that this inability "may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification." (*United States v. Wade*, at pp. 231–232; see *id.* at pp. 236–237.) ■ Although the court left open the question whether "the

---

[5] Surh testified that in order to avoid having an attorney who represented a client later becoming a witness regarding any irregularities at the lineup, "we would not appoint the same attorney to witness a lineup for a particular individual and recommend that same attorney to represent the individual."

presence of substitute counsel might not suffice where notification and presence of the suspect's own counsel would result in prejudicial delay," it also stated that "provision for substitute counsel may be justified on the ground that the substitute counsel's presence may eliminate the hazards which render the lineup a critical stage for the presence of the suspect's *own* counsel." (*Id.* at p. 237, fn. 27; see *People v. Nichols* (1969) 272 Cal.App.2d 59, 64 [76 Cal.Rptr. 846] [no constitutional violation when a qualified attorney, who could not serve at trial, "is appointed by a local judge where a lineup is about to take place"].)

Indeed, we have observed that "counsel plays only a limited role at the lineup itself . . . ." (*People v. Bustamante* (1981) 30 Cal.3d 88, 99 [177 Cal.Rptr. 576, 634 P.2d 927].) Thus, "counsel 'cannot rearrange the personnel, cross-examine, ask those in the lineup to say anything or to don any particular clothing or to make any specific gestures. Counsel may not insist law enforcement officials hear his objection to procedures employed, nor may he compel them to adjust their lineup to his views of what is appropriate.' " (*Id.* at p. 99, fn. 7.)

Rather, the "rules requiring the presence of counsel 'were adopted for two primary reasons: to enable an accused to detect any unfairness in his confrontation with the witness, and to insure that he will be aware of any suggestion by law enforcement officers, intentional or unintentional, at the time the witness makes his identification.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 368 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Those purposes were satisfied here. Stephens and West were present at the lineup to detect any unfairness or suggestiveness, and indeed, defendant does not assert that any unfairness or suggestiveness occurred. In sum, defendant's Sixth Amendment right to counsel at the lineup was not violated.

Defendant further contends that at the time of the lineup, he was still represented by the public defender because no substitution of counsel had been approved by defendant or the court. Not so. Surh testified that the municipal court called his office on November 2 to notify it of the public defender's conflict, and then again on November 3 to request two attorneys for the lineup. Under these circumstances it is apparent that the court had removed the public defender from the case based on the declaration of conflict. (See former § 987.2, subd. (a), as amended by Stats. 1986, ch. 1310, § 2, p. 4640; Code Civ. Proc., § 284, subd. 2; *People v. Sapp* (2003) 31 Cal.4th 240, 256 [2 Cal.Rptr.3d 554, 73 P.3d 433].)

### 2. *Denial of* Faretta *motions*

Defendant contends the trial court erroneously denied his motions to represent himself. (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562,

95 S.Ct. 2525] (*Faretta*).) We conclude the trial court properly denied his motions on the basis they were untimely.

### (a) *Factual background*

Defendant appeared for arraignment in municipal court on October 27, 1987. On November 6, 1987, Michael Ciraolo was appointed to represent defendant, and on November 18, 1987, Michael Berger was appointed as cocounsel. Ciraolo and Berger represented defendant at trial. James Anderson, the prosecutor at trial, also appeared on November 18, 1987.

The preliminary examination started on December 29, 1987, and was held on various dates over the ensuing eight-month period, ultimately concluding on August 15, 1988.

On June 10, 1991, defendant filed a *Marsden* motion. (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) At the June 12, 1991, hearing on the motion, defendant said due to limitations on his ability to perform legal research in jail he would need "a couple of weeks at the most" to articulate the areas in which he found counsel's performance inadequate. The court granted the continuance, and because of the court's and counsel's schedules, the hearing was ultimately held on August 1, 1991.

At the August 1 hearing, defendant said that he had been incarcerated for nearly four years. Despite defense counsel's statements to defendant when they began representing him that they would work closely with him on tactical decisions, this had not occurred, and defendant had not been informed of defense counsel's strategies and preparation. As a result, defendant lacked confidence about proceeding to trial with his present attorneys. Defendant noted that Mr. Ciraolo had only met with him a few times during his nearly four years of incarceration, and refused his telephone calls. Counsel did not adopt defendant's suggestion made during the preliminary hearing of hiring a Black investigator, which he believed would make Black witnesses less reluctant to be interviewed. He further observed that at the preliminary hearing defense counsel had failed to call any of defendant's suggested witnesses or expert witnesses, had not presented an affirmative defense despite defendant's request to do so, and had failed to promptly investigate evidence presented at the hearing which could have resulted in "that charge being dropped." Defendant further expressed concern that defense counsel had refused to let him testify and did not call his other suggested witnesses at the section 995 hearing regarding the assistance of counsel at the lineup. Nor had they "exhaust[ed] all avenues on getting that matter resolved" because they "felt we were jeopardizing preserving that [issue on] appeal. But I don't expect to be convicted of crimes I didn't do." Ciraolo had told defendant that

"if we were to start trial we would have about a week['s] worth of motions to deal with before trial," but defendant felt "even that is not a sufficient amount of arguments or motions to be dealt with in a case . . . such as mine." He expressed the view that "if there was any concern for me as a client," Ciraolo would not have told defendant he would probably have to withdraw from the case if "the court appointed agency doesn't agree to pay him more." Defendant characterized his attorneys as surrogate prosecutors, who appeared to be working against his interests.

Mr. Ciraolo responded that he had been engaged in three capital cases at the same time for a long period of time, and had recently completed in the spring of 1991 a 16-month capital trial with multiple defendants. He said, "[M]y understanding with all my clients, including Mr. Lynch, is that the case that occurred first would have the priority." Ciraolo said that defendant had been informed at the trial-setting conferences what the priorities and tentative dates were and "had no opposition to those dates and procedures." He had met with defendant throughout the preliminary hearing, and on three occasions in the nearly three years since then. Ciraolo also noted that the defense case had not been presented fully at the preliminary hearing to avoid giving the prosecutor an opportunity to negate it at trial, and that defense counsel had been successful in having several counts dismissed after the preliminary hearing. He further observed that at the hearing the parties were "dealing with very elderly alleged victims and witnesses who for a variety of reasons were not expected to be present at the time of trial." The prosecution was entitled to and did preserve this testimony, a circumstance the defense could not prevent. Moreover, the complexity of the case and the realities of the calendaring system required a certain cooperation with the prosecutor. Co-counsel Mr. Berger said that he met with defendant promptly whenever defendant called their office and requested a meeting, had written defendant at least twice, and had not been previously aware of defendant's dissatisfaction with counsel. The court denied the motion, concluding that counsel had properly and adequately represented defendant, and observing that most of defendant's complaints about counsel related to the preliminary hearing, which had concluded nearly three years earlier.

On September 4, 1991, defendant personally withdrew "his previously-entered waiver of his right to a speedy trial" and "demand[ed] to be brought to trial in this action within sixty days of the filing of this document." The matter was transferred for trial setting. On September 11, 1991, the case was assigned to Judge Delucchi for trial, or to "such other judge on the team as he may designate." That same day the parties appeared before Judge Delucchi. Counsel informed the court that they had agreed to have the case put over until October 7 for either trial setting or reassignment to a different judge.

They also informed the court that the statutory time to bring defendant to trial would run on November 1, 1991.[6]

### (1) *Defendant's first* Faretta *motion*

On September 27, 1991, defendant filed a typed motion to represent himself. The motion was supported by a memorandum of points and authorities and a sworn declaration. In his declaration, defendant stated he was "knowingly and in free will . . . waiving my right to appointed counsel." Defendant further stated, "I understand the nature of [the] charges and that I am facing the possible sentence of death if convicted." "I understand . . . I will have to abide by the rules of the court, filing motions on a timely basis and having to direct my own defense," and "take action to hire private investigators, co-counsel, [and] ancillary defense services . . . ." "I further understand that I can[]not base an appeal for 'ineffective assistance of counsel' . . . upon my own performance as acting for my own counsel, unless circumstances force my 'pro-per' defense into being 'ineffective' otherwise I am fully responsible for my defense." "I believe that as the court held in [*Faretta*], that I do not need to explain my background to the court nor is it the court's duty to inquire as to why I am electing to exercise my right of self-representation. . . . I believe that I only need to fulfill the requirements of 'knowingly and intelligently' doing so. At this time, I am requesting to have the court honor my rights of self-representation. . . . I believe I have met the requirements as outlined by *Faretta*." In his memorandum of points and authorities, defendant made fewer but similar points, and "pray[ed] to the court to grant 'Pro-Per Status' and to order along with [my] status the use of fif[]teen (15) hours telephone time (non-collect), plus twenty (20) hours use of the typewriter[] (both to be per-week). And all the 'Pro-Per' privileges accordingly so as to facilitate [my] defense as outlined in this motion."

---

[6] "A defendant is 'brought to trial' under section 1382 when the court has 'committed its resources to the trial, and the parties [are] ready to proceed and a panel of prospective jurors [is] summoned and sworn.' " (*People v. Lewis* (2001) 25 Cal.4th 610, 629 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Under the statute in effect in September 1991, absent good cause, dismissal was required "[w]hen a defendant is not brought to trial in a superior court within 60 days after the . . . filing of the information . . . except that an action shall not be dismissed under this subdivision if it is set for trial on a date beyond the 60-day period at the request of the defendant or with the defendant's consent, express or implied, . . . if the defendant is brought to trial on the date so set for trial or within 10 days thereafter." (Former § 1382, subd. (b), as amended by Stats. 1987, ch. 577, § 1, p. 1889.) Here, defendant appears to have made a general waiver on August 31, 1988, when he waived his right to be brought to trial within 60 days of the filing of the information. The parties appear to have operated on the assumption that defendant validly waived his speedy trial right in 1988, and that withdrawal of the waiver meant that trial must be held within 60 days absent any further waiver of time by defendant. The parties also appear to have operated under the assumption that because 60 days from September 4 was November 3, a Sunday, trial had to begin on November 1, or the preceding Friday.

On October 7, 1991, the parties appeared for the trial setting or reassignment conference, and for defendant's *Faretta* motion. Judge Delucchi stated he would be the trial judge. At the *Faretta* hearing in chambers, Judge Delucchi said, "Mr. Lynch, you've decided you want to go pro per on your capital case[,] correct?" Defendant replied, "Yes." The court read at length from defendant's declaration, including defendant's statements that he requested self-representation and believed he had met *Faretta*'s requirements. The court further recited defendant's statements that he believed he needed only to fulfill the requirements of a knowing and intelligent exercise of his right of self-representation, and did not believe he was required to explain his legal or educational background to the court or fill out the court's self-representation form, nor that the court had a duty to inquire as to the reason why defendant was exercising his right of self-representation. The court said, "I assume that's still your position, Mr. Lynch[,] right?" Defendant replied, "Yes, it is."

The trial court then questioned Mr. Ciraolo about how long he had represented defendant, and what work had been performed on the case. The court then asked defendant why he wanted to represent himself. As defendant began to respond, the court interrupted and said, "You know, your life is at stake here, man. You know." Defendant replied, "Yes, I'm aware of that. I'm also aware of [the] charges that I'm facing. I'm also aware of, you know, the consequences that . . . I may possibly suffer due to the fact that I . . . represent myself. But my main reason is . . . because I feel that by representing myself, I can sort of somewhat guide my case . . . in the direction that I feel it should be going in when . . . [defense counsel] Mr. Ciraolo has set up certain strategic . . . ideas or whatever in relation to my case. I'm not in charge. He is in charge." The court said, "That's right." Defendant continued, "So, therefore, actually, I don't have the say-so that I feel I should have . . . within my case because, as it is, my life on the line, . . . this is what I'm trying to seek . . . as far as representing myself, exercising my Sixth Amendment."

The court said, "Now, let me ask you a couple of questions in that regard. If you were granted pro per status, I notice here that you were talking about you want to take action to hire private investigators. Correct, you want the Court to appoint private investigators in order for you to—." Defendant interjected, "I'm not saying that I wouldn't use or continue to use the one that I already have." The court said, "But you need some time; right?" Defendant said, "Yes." The court said, "Now, you're talking about at least you either want a new private investigator or you want to use the one you already have. So, you want to avail yourself of that. You're talking about having co-counsel represent you?" Defendant replied, "Possibly, yes." The court said, "And you're talking about ancillary defense service[s]. So, what are you talking about there? You want the pro per privileges in the jail?" Defendant said, "Of

course, yes." "You want phone calls?" "Yes." "You want a runner?" Defendant replied that he would like "[u]se of [a] typewriter and law library, whatever else is available to a—."

The court interjected, "How much time are we talking about here?" Defendant said, "Actually, I hadn't considered any time as far as . . . how long it would take for me to go over . . . some of the . . . evidence and, you know." The court said, "But [defense counsel] is talking about boxes, boxes of discovery." Defendant said, "That's what I'm saying." The court said, "You're going to have to review all that stuff[,] right?" Defendant said, "Yes, and there is no way that I could say exactly how long that would take. You know." The court said, "You're talking about months?" Defendant said, "Yeah. I'm not sure." The court said, "Okay," and defendant started to speak. The court said, "Go ahead. I'm not trying to cut you off." Defendant said, "I was just going to say I would like . . . to have the right to review or to see for myself what has to be . . . gone over, . . . in order to determine . . . the outcome of what . . . I'm going to do." In a question apparently directed at defense counsel, the court inquired, "Can you tell me roughly how many hours you've spent just reviewing the police reports?" Mr. Ciraolo responded, "Your Honor, I think it would be better if you mention in weeks." Ciraolo described the prosecution's theory that the crimes contained a unique modus operandi, and noted that apparently other law enforcement agencies had sought to link defendant to similar crimes in their areas. He stated that there were "at least four boxes of reports," and that review, categorization, and consultation with an expert "has been the accumulation of four years of preparation." The court inquired whether Ciraolo had received the factors in aggravation from the district attorney. He replied that he had not, but that the district attorney had informally discussed the subject matter. Ciraolo was familiar with some of the factors, but others were new to him.

The court asked defendant whether he had seen any of the material regarding other cases mentioned by Mr. Ciraolo. Defendant said, "No." The court said, "So you would need time to review all that stuff, too[,] right?" Defendant said, "Yes." The court said that it assumed that once the prosecution filed its statement of aggravating factors, defendant would need time to review that also. Defendant replied, "Possibly." Defendant subsequently added, "But still, after reviewing [the] material, then I would be able to . . . say whether or not definitely I would need any additional time." The court said, "Yeah. Well, it's going to take you some time to review the material; right?" Defendant replied, "I'm not sure." The court said, "Well, I mean, [defense counsel] spent weeks and weeks reviewing it. . . . You can't get involved in this case when you're talking about your life, Mr. Lynch, . . . just on a shoestring. Otherwise, . . . it's not a level playing field. You know what I'm talking about?" Defendant said, "I understand. I'm just saying—." The court interjected, "I don't want to sit up there and have some guy just beat

you to death because you don't know what you're doing. You know what I'm saying?" Defendant said, "Yeah." The court said, "All right."

The court then observed the prosecution estimated trial for its case would take three to four weeks. In response to its inquiry, defense counsel said its case would take two to three weeks, and that he was not in a position to comment on any defense there might be for the penalty phase.

Defendant said, "What I want to ask you is, I seem to get that everyone beside[s] myself is sort of somewhat pushing or ready as of now . . . to go to trial. I'm trying to figure out for what reason are we all of a sudden . . . ready to proceed now that, you know, I'm requesting to exercise my Sixth Amendment rights." The court replied, "I'll give you two reasons. One, the case is four years old . . . . [¶] . . . [¶] . . . Also, you withdrew your time waiver, so you get everybody jumping around here putting this case together. [¶] . . . [¶] . . . Everybody is ready to go to trial now." Defendant said, "But, see, actually by me requesting to represent myself, that's somewhat in a sense requesting to vacate that time waiver." The court said, "I understand that. . . . [¶] . . . [¶] Because you're going to need more time. I understand that." Defendant said, "Because, truthfully, actually, the time waiver wasn't my idea. It was my attorney's idea because of some strategic move or whatever." The court said, "Whoever's idea it is, . . . when that happens, everybody . . . gets ready to go; witnesses start getting subpoenaed; I make time in my court, I move cases out of here. So when you say, hey, I want my trial, we've got to give you a trial plan. So . . . that's been started now. You see? So this is all going toward the trial. . . . [T]his is sent here. I didn't say, send me [defendant]. . . . I didn't pick you out of the hat and say, I want to try this guy tomorrow."

Defendant responded, "Yeah, well, and actually, also, before now, I've tried several times before now to file this motion in the court we [were] in before this, and that judge . . . put it off . . . . So, it's just now actually being heard." The court asked, "When did you try to file this?" Defendant said, "The last time on whatever date, the last time we [were] here, the time before that we [were] in Judge—." The court asked if defendant was referring to Judge Agretelis. Defendant said, "I guess that's his name." Mr. Ciraolo was uncertain if defendant had appeared before Judge Agretelis, and wondered if defendant was referring to Judge Goodman at the August 1 *Marsden* hearing. Defendant did not say whether this was correct, but continued, "He says at that time that he didn't want to hear the particular motion that I was ready to file." The court asked if defendant meant the September 11, 1991, hearings.

Defendant did not respond.[7] The court then said, "Okay," and asked defendant if there was "anything else you want to tell me." Defendant said, "That about covers it."

The court said, "You made it clear you want to rely on this," apparently referring to the *Faretta* motion. Defendant said, "Yes." When the court asked if defendant would refuse to fill out a pro. per. form, defendant said that he would review the form, but added that "my motion itself pretty much covers everything that's in the form." The court subsequently inquired, "[Y]ou don't think it's anybody's business to inquire as to your past education or legal expertise[,] right?" Defendant said, "To a certain degree, yes, to make sure that I'm competent, . . . and able to understand and conduct myself . . . ." The court asked, "[H]ave you ever represented yourself before?" Defendant replied, "No I haven't." The court then asked defense counsel how many *Marsden* motions had been filed in the case. Mr. Ciraolo said "just one," and added that there might have been one in municipal court.[8] The court asked, "Now you're ready to go to trial[,] right?" Ciraolo answered, "We're tooled up for it, yes, Your Honor."

The remainder of the hearing was held in the presence of the prosecutor. The court stated that it had treated defendant's "motion as sort of a quasi *Marsden* motion, including a *Faretta* motion." The court added, "I think it's apparent that he's asking that Mr. Ciraolo be removed as attorney and to substitute Mr. Lynch in himself as his own attorney." After colloquy with the prosecutor, the court observed that the waiver of the right to a speedy trial had been withdrawn on September 4, 1991, which "requires this Court to bring this case to trial no later than" November 1, 1991. It stated that although the court had pending matters, given the "no-time waiver posture," it was prepared to start pretrial motions on October 21, 1991. The prosecutor observed that he anticipated calling at least 65 witnesses during the guilt phase. The court and the prosecutor discussed the circumstance that the surviving victims and certain other witnesses were elderly, and the prosecutor observed some witnesses resided outside the San Francisco Bay Area. The prosecutor also stated that more than four years had passed since defendant's arrest. He subsequently observed that victim Bessie Herrick and her husband Frank had expressed concern about dilatory tactics. The prosecutor said he had assured the Herricks that defense counsel was not engaging in such tactics. However, the prosecutor expressed the view that "this eleventh hour request by Mr. Lynch is a cruel blow to all the victims in this case. And I would urge the Court to deny this motion by him to represent himself and

---

[7] The court later noted that according to defendant, "he's made an attempt to file this pro per motion . . . in Department One, which would mean it was sometime in September of 1991."

[8] The parties do not cite to, and we have not located in the record, a *Marsden* motion before the June 1991 motion filed in superior court.

deny him the fruits of his dilatory tactic. Justice delayed is justice denied." The prosecutor also observed that he had videotaped the testimony of the elderly witnesses at the preliminary hearing, and that if trial was delayed, "I'm not so certain that we won't be seeing cinema testimony as opposed to live bodies." In response to the court's inquiry as to whether these witnesses were "all available, they are all alert, ready to come in and testify," the prosecutor stated, "They are ready."

The court denied defendant's *Faretta* motion. Citing *People v. Frierson* (1991) 53 Cal.3d 730 [280 Cal.Rptr. 440, 808 P.2d 1197] (*Frierson*), it observed that defendant had been represented by Mr. Ciraolo for over four years, and that "because of the advanced age of the victims," and "because of the possible delay in the proceedings which might arise in the event I granted Mr. Lynch his pro per status, the Court's going to rule that this motion is not timely made. We're on the eve of the trial. The trial is to begin within two weeks. There was a time waiver [*sic*]. The Court's made space and time available for the trial of this case. Both sides are prepared to proceed. And so it's the Court's feeling that it's not timely made, so the petition to proceed in pro per will be denied for the reasons I've stated on the record." The court then informed counsel that it expected to begin pretrial motions on October 21, 1991, which it understood would take approximately three weeks, and that afterward jury selection would begin.

### (2) *Defendant's second* Faretta *motion*

On October 16, 1991, defendant filed a second *Faretta* motion, which was essentially identical to his first motion, discussed above. He also filed a *Marsden* motion and a motion to disqualify Judge Delucchi. On October 17, 1991, the court denied the disqualification motion as untimely. It also denied the *Faretta* motion as untimely, noting it had denied defendant's earlier *Faretta* motion on the same ground, and "this is even later because we are going to start the pretrial motions on Monday in this case." After denying the motion, the court said, "Also, I think it's a dilatory motion. It doesn't have any merit at all except just to postpone the proceedings, an attempt to postpone the proceedings further." Regarding the *Marsden* motion, the court stated that it was defendant's third such motion, because defendant had filed a motion in June 1991, and defendant's *Faretta* motion heard on October 7, 1991, "was essentially a *Marsden* motion that was in conjunction with his *Faretta* motion."

At the in camera hearing on the *Marsden* motion, defendant expressed concern that at the October 7, 1991, hearing on his *Faretta* motion, "blame was shifted to me as far as trying to delay this trial. I haven't been in charge of this case for the last four years." The court responded, "I shifted it to you.

I said that your motion wasn't speedy, wasn't timely made." Defendant said, "You shifted it, but after the [district attorney] changed gears . . . . [¶] . . . [¶] He sat there, and he specifically . . . stated that he [was] sure it wasn't Mr. Ciraolo's dilatory tactics, that he's trying to imply to delay the trial—." The court interjected, "That's what the [district attorney] said, man. You believe everything he says? I made the ruling . . . . You've got to understand. You heard. You were out there. You heard what the record was. It's too late, man. These people are old. You withdrew your time waiver[,] right? You say, I want a trial right now, within 60 days. [¶] . . . [¶] . . . So they assign the case to me. Right? It's all on the record from last time. I'm all ready to try this case. Mr. Ciraolo is ready to try this case. The [district attorney] is ready to try this case. Now, we've got victims in this case that are old people, . . . and they have a right to have a speedy trial, too. . . . All this is doing is you're trying to do—in my opinion is just to postpone this some more, and it's not timely made. There is law on it. I cited the case, *People v. Frierson.*" Defendant responded, expressing concern that his attorney had not disputed the district attorney's statement. He observed, "I haven't been in charge of this case for the last four years. It's not my fault they're just now arriving or coming at a trial date. [¶] . . . [¶] He's been busy with other cases, with other clients. The [district attorney] has been tied up. So, it's not my fault. It's just now that I've recently seen that what I have been seeing [makes] . . . me want to exercise my Sixth Amendment rights." The court said, "And you did." Defendant continued, "And it wasn't untimely. We haven't even started pretrial motions. We haven't started selecting the jury. We haven't set a trial date." The court said, "If it wasn't untimely and I made a mistake and you get convicted, we'll start all over again." Defendant said, "I can't see how the motion was untimely." The court said, "Well, there is no point in arguing with you . . . ." Defendant said, "If you bring up the old age clause, you had four years to worry about the old age clause. [¶] . . . [¶] You didn't even inquire [into] the fact of why [it is] . . . that the trial is" just now occurring. The court denied the *Marsden* motion.[9]

### (3) *Judge Sarkisian's ruling on defendant's* Faretta *motion*

On October 23, 1991, Judge Delucchi informed the parties that he had reconsidered his earlier ruling, and now found defendant's motion to disqualify him was timely made. The court deemed itself disqualified, and as a result set aside its October 17, 1991, rulings on defendant's second *Faretta* motion and his *Marsden* motion. Defendant attempted to withdraw his disqualification motion, but the court stated it was too late.

---

[9] The court also agreed to give defendant a transcript of the October 7, 1991, hearing on his *Faretta* motion so that he could challenge the decision in the Court of Appeal.

On October 28, 1991, the parties appeared before Judge Goodman. The court stated its understanding that defendant was "willing to enter a time waiver so that this matter can be assigned to Judge Sarkisian for trial with the understanding that the trial will commence . . . by way of pretrial motions on November 18 . . . ." Mr. Ciraolo said, "That's correct," and that defendant was "willing to give a limited time waiver up to and including November 18th." Defendant agreed. The court asked defendant if he understood his "time will then start by way of the submission of pretrial motions on November 18th or a date sometime before that?" Defendant said, "Yes."

Also on October 28, 1991, the parties appeared before Judge Sarkisian, who eventually presided over the trial. They stipulated that defendant's *Faretta* and *Marsden* motions would be submitted to Judge Sarkisian "on the transcripts of the proceedings that were held before Judge Delucchi."

On October 31, 1991, the court denied both motions. As to the *Faretta* motion, it stated: "[I]t's my independent conclusion from a review of the record[] that this request is untimely. Among the factors that I have considered in assessing the defendant's request are his prior proclivity to attempt to substitute counsel, the stage of the proceedings, and in particular the disruption and the delay that might reasonably be expected to follow the granting of his motion. This record indicates that many of the witnesses in this case are elderly. I will note that Mr. Lynch has been represented by present counsel for a number of years. Accordingly, in the exercise of my discretion, I am denying the defendant's motion for self-representation." The matter was continued to November 12, 1991, for pretrial motions.

(b) *Discussion*

 A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently. (*People v. Welch* (1999) 20 Cal.4th 701, 729 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Windham* (1977) 19 Cal.3d 121, 127–128 [137 Cal.Rptr. 8, 560 P.2d 1187] (*Windham*).) As the high court has stated, however, "*Faretta* itself and later cases have made clear that the right of self-representation is not absolute." (*Indiana v. Edwards* (2008) 554 U.S. 164, 171 [171 L.Ed.2d 345, 128 S.Ct. 2379, 2384]; see *Jones v. Barnes* (1983) 463 U.S. 745, 751 [77 L.Ed.2d 987, 103 S.Ct. 3308], citing *Faretta, supra*, 422 U.S. 806 ["we have held that, with some limitations, a defendant may elect to act as his or her own advocate . . ."].) Thus, a *Faretta* motion may be denied if the defendant is not competent to represent himself (*Indiana v. Edwards*, at p. 178 [128 S.Ct. at p. 2388]), is disruptive in the courtroom or engages in misconduct outside the courtroom that "seriously threatens the

core integrity of the trial" (*People v. Carson* (2005) 35 Cal.4th 1, 6 [23 Cal.Rptr.3d 482, 104 P.3d 837]; see *id.* at p. 8; *Faretta*, at p. 834, fn. 46), or the motion is made for purpose of delay (*People v. Marshall* (1997) 15 Cal.4th 1, 23 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*)).

▉ Likewise, we have long held that a self-representation motion may be denied if untimely. (*Windham, supra*, 19 Cal.3d at pp. 127–128.) Under *Windham*, a motion is timely if made "a reasonable time prior to the commencement of trial." (*Id.* at p. 128, fn. omitted.) "[O]nce a defendant has chosen to proceed to trial represented by counsel," a defendant's motion for self-representation is "addressed to the sound discretion of the court."[10] (*Windham*, at p. 128.) We observed that our imposition of a timeliness "requirement should not be and, indeed, must not be used as a means of limiting a defendant's *constitutional* right of self-representation." (*Id.* at p. 128, fn. 5.) Rather, the purpose of the requirement is "to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice." (*People v. Burton* (1989) 48 Cal.3d 843, 852 [258 Cal.Rptr. 184, 771 P.2d 1270] (*Burton*).)

The high court has observed that lower courts generally require a self-representation motion to be timely, a limitation that reflects that "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." (*Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.* (2000) 528 U.S. 152, 162 [145 L.Ed.2d 597, 120 S.Ct. 684].) Despite this tacit approval of the timeliness limitation on the self-representation right, the high court has never delineated when a motion may be denied as untimely. Nor has this court fixed any definitive time before trial at which a motion for self-representation is considered untimely, or articulated factors a trial court may consider in determining whether a self-representation motion was filed a reasonable time before trial.

▉ Along these lines, we have held on numerous occasions that *Faretta* motions made on the eve of trial are untimely. For example, in *Frierson, supra*, 53 Cal.3d at page 742, the case relied on here by the trial court, we held that a self-representation motion made on September 29, 1986, when trial was scheduled for October 1, 1986, was made on "the eve of trial" and was untimely. (See *People v. Valdez* (2004) 32 Cal.4th 73, 102 [8 Cal.Rptr.3d 271, 82 P.3d 296] [*Faretta* motion made "moments before jury selection was

---

[10] In assessing an untimely self-representation motion, the trial court considers such factors as "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham, supra*, 19 Cal.3d at p. 128.)

set to begin" deemed untimely]; *People v. Horton* (1995) 11 Cal.4th 1068, 1110 [47 Cal.Rptr.2d 516, 906 P.2d 478] [self-representation motion made on the date scheduled for trial untimely]; *People v. Clark* (1992) 3 Cal.4th 41, 99–100 [10 Cal.Rptr.2d 554, 833 P.2d 561] (*Clark*) [case had been continued day to day after Aug. 10 "in the expectation that the motions would be concluded and jury selection set to begin at any time," and hence the defendant's Aug. 13 motion was "in effect the eve of trial" and untimely].)

Likewise, we have concluded that motions for self-representation made long before trial were timely. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 434 [64 Cal.Rptr.3d 721, 165 P.3d 512] [*Faretta* motion made seven months before penalty retrial jury selection commenced was timely]; *People v. Stanley* (2006) 39 Cal.4th 913, 932 [47 Cal.Rptr.3d 420, 140 P.3d 736] (*Stanley*) [self-representation motion made one year before the preliminary hearing and nearly two years before trial was timely].)[11] Nevertheless, our refusal to identify a single point in time at which a self-representation motion filed before trial is untimely indicates that outside these two extreme time periods, pertinent considerations may extend beyond a mere counting of the days between the motion and the scheduled trial date.

Indeed, in *People v. Hamilton* (1985) 41 Cal.3d 408, 419–420 [221 Cal.Rptr. 902, 710 P.2d 981] (*Hamilton I*),[12] we deemed *untimely* a self-representation motion made about a month before trial. In *Hamilton I*, the parties had been engaged in a protracted section 1538.5 and section 995 hearing from March 24, 1980, to May 21, 1980. (*Hamilton II, supra*, 45 Cal.3d at p. 363, incorporating *Hamilton I*, at p. 419.) At that time, trial was

---

[11] We have also deemed timely motions for self-representation that were made in conjunction with a successful motion to relieve defense counsel (*People v. Joseph* (1983) 34 Cal.3d 936, 939–944 [196 Cal.Rptr. 339, 671 P.2d 843] [motion made on the day the court had relieved defense counsel was timely]), or that immediately followed the dismissal of counsel (*People v. Dent* (2003) 30 Cal.4th 213, 215–217, 221 [132 Cal.Rptr.2d 527, 65 P.3d 1286] [motion made on the day trial scheduled to begin timely because on that day the court had relieved defense counsel and continued the case prior to defendant's motion]).

[12] In *Hamilton I*, this court affirmed the judgment of guilt, but set aside the special circumstance findings for error under *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], and accordingly reversed the penalty judgment. (*Hamilton I, supra*, 41 Cal.3d at pp. 413, 431–432.) The high court granted the Attorney General's petition for writ of certiorari, vacated the judgment, and remanded the case to this court for further consideration in light of *Rose v. Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101]. (*California v. Hamilton* (1986) 478 U.S. 1017 [92 L.Ed.2d 734, 106 S.Ct. 3328]; *People v. Hamilton* (1988) 45 Cal.3d 351, 356 [247 Cal.Rptr. 31, 753 P.2d 1109] (*Hamilton II*).)

In *Hamilton II, supra*, 45 Cal.3d at page 363, we adopted that portion of *Hamilton I* addressing the guilt issues, including the defendant's claim that the trial court had erred in denying two *Faretta* motions, as our decision on remand. We also discussed the procedural context in which these two motions were made, as well as the defendant's new claim that the trial court had erred in denying yet another *Faretta* motion made below. (*Hamilton II*, at pp. 366–369.)

scheduled for June 23, 1980. (*Ibid.*) On May 1, 1980, the defendant moved for self-representation, but on May 9 he withdrew the motion and sought cocounsel status. That request was granted. (*Ibid.*) On May 20, the defendant sought to have his "counsel relieved and new counsel appointed. [The] [d]efendant stated that if that motion were denied, he would then renew his motion" for self-representation. (*Ibid.*) Finding that the "defendant did not have 'a legitimate objection, but [was] only grasping at anything he can think of to delay the proceedings,' the court denied the motion." (*Hamilton II, supra,* at p. 366.) On appeal, we held that the self-representation motion made on May 20 was "untimely within the context of this protracted section 1538.5/995 hearing," and the trial court acted within its discretion in denying it. (*Id.* at p. 363, incorporating *Hamilton I,* at p. 420.) Thus, in *Hamilton II,* we concluded that the defendant's pretrial self-representation motion, made about a month before trial, was untimely in light of the surrounding circumstances.

Similarly, in *People v. Ruiz* (1983) 142 Cal.App.3d 780, 791 [191 Cal.Rptr. 249], the Court of Appeal concluded that a motion made six days before trial was untimely "under the circumstances surrounding" the defendant's request. The "motion was made on a Friday[,] the hearing was held on the following Monday and trial was scheduled to begin Thursday, with both defense and prosecution counsel ready to proceed and with a serious witness problem at hand." (*Ibid.*) The prosecutor noted he had had "great difficulty" securing the presence of one witness, who was under subpoena, and other witnesses had expressed fear of testifying. (*Id.* at p. 785.)

█ As *Hamilton II* and *Ruiz* demonstrate, timeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made. An analysis based on these considerations is in accord with the purpose of the timeliness requirement, which is "to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice." (*Burton, supra,* 48 Cal.3d at p. 852.)

Some Ninth Circuit cases contain dicta suggesting that "requests made 'weeks before trial' " are invariably timely, purporting to divine such a rule from *Faretta* itself. (*Marshall v. Taylor* (9th Cir. 2005) 395 F.3d 1058, 1061.) It is true that the particular request for self-representation in *Faretta* was made "weeks before trial" (*Faretta, supra,* 422 U.S. at p. 835), and the high court did characterize this as being "[w]ell before the date of trial." (*Id.* at p. 807.) But *Faretta* nowhere announced a rigid formula for determining timeliness without regard to the circumstances of the particular case. Indeed, the timeliness of the request was not even contested in *Faretta*. Moreover, the defendant there was charged with grand theft (*ibid.*)—not, as here, with three

counts of capital murder and two additional counts of attempted murder. Although of course *Faretta* applies in a capital case, nothing in *Faretta* or its progeny either expressly or implicitly precludes consideration of factors other than the number of weeks between the self-representation motion and the trial in determining timeliness in this more complex and serious scenario. Rather, the high court's statement in *Faretta* that the defendant's motion was "weeks before trial" implies a recognition that a motion that interferes with the orderly process of a trial may be denied. (*Id.* at p. 835; see *id.* at p. 836 ["forcing Faretta, *under these circumstances*, to accept [counsel] against his will . . . deprived him of his constitutional [self-representation] right . . ." (italics added)].)

Indeed, in the related context of the Sixth Amendment right to select counsel of one's choice, which is also subject to automatic reversal if erroneously denied, the high court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness [citation], and against the demands of its calendar." (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 152 [165 L.Ed.2d 409, 126 S.Ct. 2557]; see *Morris v. Slappy* (1983) 461 U.S. 1, 11 [75 L.Ed.2d 610, 103 S.Ct. 1610] ["Trial judges necessarily require a great deal of latitude in scheduling trials."].) Thus, a trial court may "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." (*United States v. Gonzalez-Lopez*, at p. 152.) We perceive no principled basis on which to deny a trial court the opportunity to similarly consider the needs of fairness and the demands of its calendar in ruling on a request for *self*-representation, or to accord the defendant seeking self-representation any greater liberty to do so than the defendant seeking to select retained counsel.

Nor do our prior cases preclude a trial court from considering the totality of the circumstances in assessing the timeliness of a request for self-representation. Thus, in *Marshall, supra,* 15 Cal.4th 1, where the defendant's self-representation motion was made on February 23, 1988, and trial was set to begin on March 28, 1988, we stated that the high court "has not spoken on the question whether the trial court may deny a timely request for self-representation if the motion is insincere, ambivalent, or unconsidered . . . ." (*Id.* at p. 21.) We did not decide whether this request was timely, however, since we upheld the trial court's denial of the defendant's *Faretta* motion on the independent ground that the request was equivocal. (*Id.* at p. 27.)

In *People v. Wilks* (1978) 21 Cal.3d 460, 463–464 [146 Cal.Rptr. 364, 578 P.2d 1369], trial was set for October 14, 1975, but the prosecutor was not ready to proceed on that date. The defendant moved for self-representation, and the trial judge transferred the case to a different department "for hearing 'forthwith' on the motion regarding representation and for trial on November

20th." (*Id.* at p. 464.) On appeal, we rejected the defendant's claim that the trial court erred in granting his self-representation motion noting, "A trial court has no discretion to deny an accused's valid motion for self-representation." (*Id.* at p. 467.) Although it is not clear from our opinion in *Wilks* whether the trial had been scheduled for November 20 before the defendant's self-representation motion, we later stated that "[i]n *Wilks* . . . the court granted a motion for self-representation made over a month before trial was scheduled to begin. [Citation.] We did not [thereby] establish a hard and fast rule that any motion made before trial—no matter how soon before—was timely." (*Clark, supra,* 3 Cal.4th at p. 99.)

As noted above, the defendant in *Clark* filed his motion essentially on "the eve of trial." (*Clark, supra,* 3 Cal.4th at p. 100.) In distinguishing such a late motion from the motion made in *Wilks,* we did not conclusively determine in *Clark* that a motion made over a month before trial was timely, but merely observed that *Wilks* was not persuasive authority for the defendant's eve-of-trial motion. (*Clark,* at p. 99.)

■ As can be seen, the high court's cases and those of this court guide us to the conclusion that a trial court may consider the totality of the circumstances in determining whether a defendant's pretrial motion for self-representation is timely. Thus, a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation.

Here, we conclude the trial court properly denied as untimely defendant's September 27, 1991, and October 16, 1991, motions for self-representation. As noted above, this case involved three counts of murder and two counts of attempted murder. Each of these counts involved a separate incident. Concomitant with these counts were charges of burglary and robbery, allegations that defendant personally inflicted great bodily injury on the elderly attempted murder victims, and special circumstance allegations of burglary murder, robbery murder, and multiple murder, which if found true subjected defendant to a possible death sentence. The prosecutor anticipated calling at least 65 witnesses at the guilt phase. Discovery was voluminous,[13] and trial preparation inherently complex.

---

[13] At the time of defendant's self-representation motions, former section 1054.2 provided: "No attorney may disclose or permit to be disclosed to a defendant the address or telephone number of a victim or witness . . . unless specifically permitted to do so by the court after a hearing and a showing of good cause." (Former § 1054.2, added by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990).) Thus it appears that the addresses and telephone

■ Moreover, this case involved crucial witnesses, as well as victims, who were elderly. The victims and the prosecution had a right to a speedy trial. (Cal. Const., art. I, § 29; see *Morris v. Slappy, supra,* 461 U.S. at p. 14 ["[I]n the administration of criminal justice, courts may not ignore the concerns of victims."].) ■ Although the testimony of these witnesses had been preserved on videotape, the presentation of live witnesses is the preferred form of evidence. (See *People v. Reed* (1996) 13 Cal.4th 217, 225 [52 Cal.Rptr.2d 106, 914 P.2d 184] ["The fundamental purpose of the unavailability requirement is to ensure that prior testimony is substituted for live testimony, the generally preferred form of evidence, only when necessary."].)

In addition, on August 1, 1991, Mr. Ciraolo had informed Judge Goodman that there was an October 7 "date to set for trial," and that the parties' understanding with the presiding judge was that they would be given a trial date about "two weeks of the 7th." On September 4, 1991, defendant personally withdrew his time waiver and demanded he be brought to trial within 60 days. At the October 7 hearing on defendant's first self-representation motion, the defense said it was ready for trial. Pretrial motions were expected to begin two weeks later, and trial to commence about three weeks after that. A case that had endured significant delay was finally nearing resolution.

Although our review of the record demonstrates that the nearly four-year delay in this case cannot be attributed to defendant, he did not thereby escape any responsibility for timely invoking his right to self-representation. We note that at the August 1 hearing on defendant's first *Marsden* motion, he gave no explanation for why he had waited nearly three years to express concern about counsel's perceived deficiencies at the preliminary hearing; and that defendant inexplicably waited until after his disqualification motion had been granted by Judge Delucchi to seek to withdraw it. Similarly, defendant, who had been represented by the same counsel nearly since his arrest, gave no explanation at the hearings on his self-representation motions why he had waited nearly four years, or until the parties were prepared to proceed to trial, to seek self-representation. He simply announced at the October 7, 1991, hearing that because his life was "on the line," he should be in charge. Clearly this was a circumstance of which he was aware well before the filing of his first motion on September 27, 1991, but, at the October 17 hearing on his second motion, he offered only the feeble explanation that "[i]t's just now that I've recently seen that what I have been seeing [makes] . . . me want to exercise my Sixth Amendment rights[] [¶] . . . [¶] . . . to represent myself."

---

numbers of the victims and witnesses would have had to be redacted from the boxes of police reports and other material before defendant could have even started reviewing it.

■ Moreover, at the October 7 hearing on his first self-representation motion, defendant did not dispute that he would need time to investigate and prepare, and replied both "Yeah" and "not sure" when asked if he was "talking about months" of time to do so. Indeed, he said he needed time to review the discovery and other materials *before* he could tell the court how much *additional* time he would require, expressed confusion that "everyone beside[s] myself is . . . ready as of now . . . to go to trial," and characterized his self-representation motion as "vacat[ing]" his recent withdrawal of his time waiver. The reasonable import of these comments is that if the self-representation motion had been granted, defendant would have required an undetermined amount of time to investigate and prepare for trial. A trial court may properly consider the delay inherently caused by such uncertainty in evaluating timeliness. (See *Morris v. Slappy, supra,* 461 U.S. at p. 11 ["Trial judges necessarily require a great deal of latitude in scheduling trials."]; cf. *United States v. Gonzalez-Lopez, supra,* 548 U.S. at p. 152 [recognizing a "trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness [citation], and against the demands of its calendar"].)

■ In light of all these circumstances, defendant's self-representation motions were properly deemed untimely. Thus, the trial court had discretion to deny the motions, and acted well within its discretion in doing so on the grounds that certain witnesses including the surviving victims were elderly, the parties were otherwise prepared to proceed, defendant had offered no justification for his untimely request to represent himself, and granting the motion was reasonably likely to result in substantial delay and disruption of the proceedings.

### 3. *Excusing prospective jurors for cause due to their views concerning the death penalty*

Defendant contends the trial court erroneously excused four prospective jurors because of their views regarding the death penalty in violation of his rights under the Sixth and Fourteenth Amendments to the federal Constitution. We disagree.

#### (a) *Factual background*

##### (1) *Excusal of Prospective Juror K.M.*

In Prospective Juror K.M.'s questionnaire, when asked her feelings about the death penalty, she wrote, "If the crime was of the nature to warrant the death penalty I believe it should be done." During voir dire, the court inquired whether K.M. would "automatically vote for the death penalty regardless of what evidence might be presented" at the penalty phase. She

responded, "I do believe in the death penalty, but I don't know if I could be the person who says, okay, this is it, you have to decide whether this person gets it or not. I don't know if I could really do it." The court subsequently inquired, "I want you to assume that you, personally, have decided that the factors in aggravation are so substantial that you personally do believe in your heart that the death penalty is the appropriate punishment. . . . [¶] . . . [¶] If that was your decision, the law then would require you to come down into this courtroom, sit where you are and, basically, say so, yes, that is my decision, it is my decision that death is the appropriate penalty under all of the circumstances. Could you do that?" K.M. responded, "I think so. [¶] . . . [¶] There would have to be absolutely elimination of everything to the point that that is the only thing left to do." The court asked what she meant by "elimination of everything." K.M. responded, "[A]ny other thoughts, thinking there is a chance that he should have life rather than death. I would have to just clear it out in my mind completely."

The prosecutor asked K.M., "If you think the death penalty is appropriate, . . . you are going to have to come down and announce in open court, in front of Mr. Lynch, in front of his defense attorneys, Judge Sarkisian, in front of me and maybe a packed courtroom, that you, [K.M.], are voting to impose the death penalty, knowing that that is going to be the first step which leads to his execution by lethal gas, strapped in a chair in the gas chamber in San Quentin sometime in the future, do you understand that?" K.M. responded, "Yes, I do." The prosecutor then asked, "Your vote for death, you are one-twelfth of the thing that's going to put him in that gas chamber, you realize that?" K.M. said, "Yes." The prosecutor said, "Okay. My question to you is: Can you do that? Can you be part and parcel of a panel of people which sends somebody to their death?" K.M. responded, "No, I honestly cannot give a direct answer to that because I don't know how I could live with myself. Can I actually be part of a group that would say this man has to die?" After further colloquy, the prosecutor said, "We have to know. Can you do it?" K.M. responded, "[W]hen you think something in your mind one way and then when it comes right down to it, like you say, I don't know, so I guess the answer would have to be, no, wouldn't it?"

In response to questioning by defense counsel, K.M. said, "I don't want to be . . . the final person to say, okay, do it." K.M. also agreed with defense counsel, however, that there were circumstances in which she could return a death penalty verdict, and that she would keep an open mind and hear all of the facts and circumstances before she decided.

The court told K.M. that she "sounded like a different person" when she answered defense counsel's questions than when she answered the prosecutor's questions, but explained, "I have to make sure I understand your views.

My sense of your views [is]—and I want you to correct me if I am wrong—that you do believe in the death penalty, and you think there are certain cases that warrant the death penalty, but that your views are such that even if you personally determined that death was the appropriate penalty under all of the circumstances in this case, you could not come down into open court, face Mr. Lynch, and announce that that is your vote, knowing that that is going to cause him to be put to death in the gas chamber, . . . am I correct?" K.M. responded, "Yes."

The prosecutor challenged K.M. for cause. Defense counsel opposed the challenge. The trial court sustained the challenge, stating: "I was carefully listening to her answers. I was carefully observing her demeanor as she answered the questions. She gave, at least arguably, I think more than arguably, inconsistent or equivocal answers, and I'm satisfied that her views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with the court's instructions and her oath."

### (2) Excusal of Prospective Juror O.C.

In Prospective Juror O.C.'s questionnaire, when asked her feelings about the death penalty, she wrote, "I feel that the death penalty should be imposed on certain individual[s] but not all. Also I'm not against or in favor of it." On voir dire, the court asked O.C. whether the crimes in this case were "serious enough where the death penalty is a possibility or not." It observed that some individuals would say that "this type of crime, it's terrible, but it's not so terrible that I would . . . ever vote for death, life in prison is always going to be fine." O.C. responded, "I would say probably life in prison." The prosecutor challenged her.

Defense counsel inquired whether O.C. would vote for the death penalty if it were on the ballot. She said, "I don't know. I don't believe so. I don't think." Defense counsel also asked whether the facts and circumstances of this case were such that she could vote for the death penalty. O.C. responded, "Possibility." Defense counsel asked, "Think about it and do it?" She said, "Possibility, yes." "Do you think you could?" "Probably so." Defense counsel then opposed the challenge.

The prosecutor asked O.C., "Do you think you could ever personally vote to send somebody to die in the gas chamber?" O.C. responded, "I don't think so." The prosecutor said, "Because if you sit in judgment in this case, you and the other jurors are going to have to make that choice. And if you think that the death penalty is appropriate, you are going to come down here in open court and you are going to have to say I, [O.C.] [am] voting to send that

man at the end of the table to die in prison, in the gas chamber, could you do that?" O.C. responded, "I don't believe so."

The trial court sustained the challenge, stating: "I have been observing this prospective juror, her demeanor and listening to her responses, . . . and I'm satisfied that her views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath."

### (3) *Excusal of Prospective Juror L.K.*

In Prospective Juror L.K.'s questionnaire, when asked her feelings about the death penalty, she wrote, "I do believe in the death penalty if warranted." On voir dire, in response to the trial court's question regarding whether L.K. would invariably vote for the death penalty, L.K. stated, "[T]o be perfectly honest, I don't know exactly what kind of verdict I would give. I don't feel comfortable with either penalty. . . . I don't want to have to be put in the position to make that decision. If I'm going to have to, I'm going to have to. But I'd rather not say at this point." The trial court assured L.K. that "[n]o one is going to ask you this afternoon which punishment you would vote for." L.K. subsequently responded, "Yes" when asked by the court if she honestly believed that she would be "open to the possibility of voting for either punishment, depending upon the totality of the evidence presented."

The prosecutor asked L.K. to explain her statement that she was not comfortable with either penalty. L.K. responded, "I'm not comfortable making a decision for somebody else. That's all." He also asked, "Let's assume you and the 11 others . . . feel the death penalty is warranted. You are going to have to come down to open court and announce that verdict in open court that you are voting for the death penalty. You realize that?" L.K. responded in the affirmative. The prosecutor then asked, "Do you know what the ramifications of that death penalty vote are going to be?" "No. I don't understand." "Well, if you vote for the death penalty, you and 11 others, you are going to be one-twelfth, you, yourself, are one-twelfth of a panel of people which are recommending that Mr. Lynch be put to death in the gas chamber, you realize that?" L.K. responded, "Yes." The prosecutor said, "And if you vote for death, it's going to happen sometime in the future." L.K. said, "Yes." The prosecutor subsequently described individuals who said they believed in the death penalty if it was called for, but then were unable to choose the death penalty as a verdict even though they believed the defendant deserved that penalty. He asked L.K., "Do you have any feelings as to that?" She responded, "Yeah. That's why I say I'm not comfortable in making the decision. I believe that, but like I said, I'm not comfortable in making the decision."

The court inquired whether L.K. could come into court and announce her decision if she were to conclude that death was the appropriate penalty under all the circumstances. L.K. responded, "It's hard to say, to tell you the truth." The court said, "Well, if that was your vote, the jury would be polled, and you would be asked if it was your decision to vote for the death penalty. And if that was your decision, it would be your duty to answer 'Yes.' Are you telling me that you don't think you can do that or you are not sure that you could do that if you personally determined upstairs that death was the appropriate punishment after this determining process?" L.K. responded, "No, I don't." The prosecutor challenged L.K., defense counsel said, "Submitted," and the trial court sustained the challenge. The court stated: "I will indicate I've been carefully listening to the juror's responses, and it's my view that her views are such that . . . they would prevent or substantially impair the performance of her duties as a juror in accordance with the court's instructions and oath."

### (4) Excusal of Prospective Juror R.P.

In Prospective Juror R.P.'s questionnaire, when asked her feelings about the death penalty, she appeared to write, "fine." On voir dire by the court, she responded, "No," when asked if she would invariably impose the death penalty. The court then asked whether she felt that the crimes in this case were "serious enough where the death penalty could possibly apply." R.P. responded, "Well, if the second trial is evidence, you know, warrants it or I think maybe it proves up to a certain point, yes, that—that could be possible." The court subsequently said, "So I take it from your answers that if at the end of the case you thought that the death penalty was the appropriate punishment, if you felt the aggravating circumstances were so bad, and death was really the appropriate punishment that you could vote for the death penalty, am I correct?" R.P. responded, "I guess so." At the end of voir dire by the court, it inquired whether there was anything else R.P. "would like to tell us concerning your views on the death penalty . . . ?" R.P. responded, "Well, it was [sic] just have to be so horrible, you know, beyond wildest imagination, before I could just say somebody got to die." The court said, "Well, you have heard . . . the general descriptions of what you will have decided happened. If we ever reach a penalty trial. And let me just again ask you preliminarily, are those crimes serious enough where the death penalty could possibly apply?" R.P. responded, "No, not really." The prosecutor challenged R.P., defense counsel submitted the matter, and the court sustained the challenge. The court stated: "I have been carefully observing [R.P.] and listening to her responses. While there might be arguably inconsistent or equivocal responses, it is my conclusion that her views on capital punishment would prevent or substantially impair the performance of her duty in accordance with her instructions and oath."

(b) *Analysis*

■■■ "The federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment is ' "[w]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 56 [97 Cal.Rptr.3d 1, 211 P.3d 520] (*Friend*), quoting *Uttecht v. Brown* (2007) 551 U.S. 1, 7 [167 L.Ed.2d 1014, 127 S.Ct. 2218].) "The standard of review of the court's ruling regarding the prospective juror's views on the death penalty is essentially the same as the standard regarding other claims of bias. If the prospective juror's statements are conflicting or equivocal, the court's determination of the actual state of mind is binding. If the statements are consistent, the court's ruling will be upheld if supported by substantial evidence." (*People v. Horning* (2004) 34 Cal.4th 871, 896–897 [22 Cal.Rptr.3d 305, 102 P.3d 228].)

No error appears in excusing these prospective jurors for cause. The record here, set forth above, demonstrates that the prospective jurors equivocated with respect to their ability to follow the law concerning imposition of the death penalty. The trial court was in a position, which we are not, to view their demeanor, and its determination of their state of mind is binding. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown, supra,* 551 U.S. at p. 9.)

■■■ Defendant contends that the responses of Prospective Juror R.P. do not support her removal for cause. As set forth above, the prosecutor challenged R.P. after voir dire by the court. Defense counsel did not question R.P., or object to the prosecutor's challenge, but merely submitted the matter. "Hence, as a practical matter, he 'did not object to the court's excusing the juror, but . . . also refused to stipulate to it.' " (*People v. Schmeck* (2005) 37 Cal.4th 240, 262 [33 Cal.Rptr.3d 397, 118 P.3d 451] (*Schmeck*), quoting *People v. Cleveland* (2004) 32 Cal.4th 704, 734 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Although this court has concluded that a failure to object does not forfeit the *Witherspoon-Witt* issue on appeal, the high court has recognized that a reviewing court "nevertheless take[s] into account voluntary acquiescence to, or confirmation of, a [prospective] juror's removal." (*Uttecht v. Brown, supra,* 551 U.S. at p. 18; see *Wainwright v. Witt* (1985) 469 U.S. 412, 434–435 [83 L.Ed.2d 841, 105 S.Ct. 844] [in light of defense counsel's failure to question the prospective juror or object to her excusal for cause, "it seems that . . . no one in the courtroom questioned the fact that her beliefs prevented her from sitting"]; *Witherspoon v. Illinois* (1968) 391 U.S.

510 [20 L.Ed.2d 776, 88 S.Ct. 1770]; *Cleveland,* at pp. 734–735 [defense counsel's failure to object suggests "counsel concurred in the assessment that the juror was excusable"].) Moreover, "[b]y failing to object, the defense did not just deny the conscientious trial judge an opportunity to explain his judgment or correct any error. It also deprived reviewing courts of further factual findings that would have helped to explain the trial court's decision." (*Uttecht v. Brown, supra,* 551 U.S. at p. 18.) Under these circumstances, defendant has little cause to challenge the excusal of Prospective Juror R.P. on the ground that the record does not clearly demonstrate her bias. Moreover, we defer as we must to the trial court's evaluation of the prospective juror's demeanor, which the court expressly stated it had carefully observed, together with her responses. The trial court was entitled to credit Juror R.P.'s statement that she would not consider death as a potential penalty in this proceeding.

Defendant contends the prosecutor's description of what Prospective Jurors K.M., O.C., and L.K. would be required to do if they chose death as the punishment was misleading, and intentionally invoked "graphic images, and inflammatory language to cause [the prospective jurors] to recoil and shrink from the task at hand." Not so. The prosecutor simply inquired whether the jurors would be able to affirm in open court a vote for a death verdict. We recently rejected a similar challenge in *People v. Bramit* (2009) 46 Cal.4th 1221 [96 Cal.Rptr.3d 574, 210 P.3d 1171], in which the prosecutor asked on voir dire: " 'Is there anyone who feels they could not return [a death verdict] if justice demanded it and say, "Yes, I voted for the death of this person." ' " We concluded that the "predicate of the question was sound" because "[j]urors must be prepared to affirm their verdicts." (*Id.* at p. 1235, fn. omitted, citing §§ 1149, 1163.) Likewise, in *People v. Samayoa* (1997) 15 Cal.4th 795, 853 [64 Cal.Rptr.2d 400, 938 P.2d 2], we rejected a claim the prosecutor committed misconduct when he inquired of prospective jurors "whether, if polled after returning a sentence of death, they could 'stand up and tell' defendant or 'look at the defendant' and tell him that their verdict was death." We observed: "By its choice of questions, the prosecution evidently sought to shed light upon the prospective jurors' views of capital punishment in order to enforce their appreciation of the gravity of the decision regarding a sentence of death. The prosecution's use of such phrases as 'look at the defendant' was an acceptable means of impressing upon each prospective juror that the verdict of death would affect a real person who would be in the courtroom at that time, and sought to elicit whether, under these circumstances, the prospective juror nevertheless would be able to vote for death. The inquiry therefore was directed toward ascertaining whether each prospective juror's views concerning capital punishment would ' " ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " ' " (*Ibid.*)

Defendant further contends that this court "has taken a wrong turn" in deeming as binding a trial court's finding of substantial impairment when the juror has equivocated in his or her responses with respect to an ability to follow the law concerning imposition of the death penalty. We have repeatedly rejected this claim, and the "high court's most recent ruling on this subject reaffirms that deference to the trial court is appropriate when the prospective juror's remarks are ambiguous or equivocal." (*People v. Lewis* (2008) 43 Cal.4th 415, 483 [75 Cal.Rptr.3d 588, 181 P.3d 947], citing *Uttecht v. Brown, supra,* 551 U.S. at p. 9; see, e.g., *Schmeck, supra,* 37 Cal.4th at pp. 262–263.)

In sum, we conclude that the trial court did not err in excluding the four prospective jurors for cause.

### 4. *Failure to sever counts*

Defendant contends the trial court erred in denying his pretrial motion to sever the counts, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel state constitutional provisions,[14] in that the evidence was not cross-admissible on the issue of identity. We disagree.

Defendant concedes that the charged offenses here were of the same class, and accordingly joinder was permissible under section 954. "Where the statutory requirements for joinder are met, the defendant must make a clear showing of prejudice to demonstrate that the trial court abused its discretion." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1128 [63 Cal.Rptr.3d 297, 163 P.3d 4] (*Zambrano*).)

"In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.'" (*People v. Soper* (2009) 45 Cal.4th 759, 774 [89 Cal.Rptr.3d 188, 200 P.3d 816] (*Soper*), quoting *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 [78 Cal.Rptr.3d 272,

---

[14] In this and certain other appellate claims defendant contends the asserted error infringed upon his constitutional rights. "In those instances where he did not present constitutional theories below, it appears that either (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution. 'To that extent, defendant's new constitutional arguments are not forfeited on appeal.' (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].) No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7 [80 Cal.Rptr.3d 630, 188 P.3d 580].)

185 P.3d 708] (*Alcala*).) "The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case." (*Zambrano*, *supra*, 41 Cal.4th at pp. 1128–1129.) "[I]f evidence underlying the offenses in question would be 'cross-admissible' in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses." (*Alcala*, *supra*, at p. 1221; see *Zambrano*, *supra*, at p. 1129.) "[A] jury may consider properly admissible 'other crimes' evidence so long as it finds 'by a preponderance of the evidence' that the defendant committed those other crimes." (*Alcala*, *supra*, at p. 1224, fn. 14; see *Soper*, *supra*, at p. 778.)

We have explained that "there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: 'The least degree of similarity . . . is required in order to prove intent. [Citation.] . . . In order to be admissible [for that purpose], the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*Soper*, *supra*, 45 Cal.4th at p. 776, italics omitted, quoting *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*).) "By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity." (*Soper*, at p. 776, fns. omitted.)

"For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.) The inference of identity, however, "need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together." (*People v. Miller* (1990) 50 Cal.3d 954, 987 [269 Cal.Rptr. 492, 790 P.2d 1289] (*Miller*).) Moreover, "the likelihood of a particular group of geographically proximate crimes being unrelated diminishes as those crimes are found to share more and more common characteristics." (*Id.* at p. 989.)

In *Soper*, two homicides occurred within four months of each other at campsites that were easy walking distance from each other, forensic evidence tied the defendant to each crime scene, and witnesses linked the defendant to

each victim close to the time of death. (*Soper*, *supra*, 45 Cal.4th at p. 778, fn. 14.) We agreed with the People that this evidence appeared to be cross-admissible on the issue of identity. (*Id.* at p. 779.) Likewise, in *Alcala*, we concluded that evidence that each of the five homicide victims was a young, single, Caucasian female who was discovered unclothed or nude from the waist down, all of the homicides involved blunt-force facial trauma and appeared to involve a sexually sadistic motive, and the offenses occurred within a 19-month period, supported a conclusion by a preponderance of the evidence that the defendant was the perpetrator in each homicide. (*Alcala*, *supra*, 43 Cal.4th at p. 1224.)

In *Miller*, we found numerous common features among four murders and four attempted murders, including that all of the victims were homosexual, and most were attacked "shortly after leaving gay bars." (*Miller*, *supra*, 50 Cal.3d at p. 988.) These two features were the most distinctive, and "by themselves create[d] at least a reasonable suspicion that the crimes [were] related . . . ." (*Ibid.*) We further found additional common features, which viewed in the aggregate, were "highly significant because of their number." (*Ibid.*) These included the circumstances that "all but one of the crimes occurred in West Hollywood"; "all the attacks occurred on a weekend or holiday" and around midnight; "all but one of the attacks occurred near the curb on a quiet side street"; "all the victims were attacked with a blunt instrument" and received blows to the head; a car similar to the defendant's "was seen in the vicinity of at least two of the murders"; all four murder victims and one attempted murder victim were "found without wallet, money, or identification"; "offers of marijuana, or evidence of possible marijuana use, were present in a number of the crimes"; and the attacks apparently occurred without warning. (*Ibid.*) Taken together, these common characteristics logically operated to set the murders and attempted murders "apart from other crimes of the same general variety and, in so doing, tend[ed] to strongly suggest that defendant was the perpetrator of all eight crimes." (*Id.* at p. 989.)

Here, the evidence produced at the preliminary hearing, which was substantially similar to the evidence later presented at trial and described *ante*, at pages 702–706, was cross-admissible on the issue of identity. All of the attacks occurred within a two-month period in the nearly adjacent communities of San Leandro and Hayward. All of the victims were Caucasian elderly women who were attacked in their homes. Three of the victims lived in corner houses; Durham lived next to and had regular access to her daughter's corner house; and Figuerido's house was separated from the next building on the left by an empty one-half acre. All of the victims suffered blunt trauma to the head, and either were robbed or robbery was attempted. Figuerido, Constantin, Herrick, and Durham were attacked during the day, and the jury could reasonably infer Larson's death also occurred during the day, based on the circumstance that she did not answer her telephone during the afternoon,

even though she had plans to meet with a friend, and that she failed to move her car. Defendant was identified at or near the victim's house for each incident, and in the case of Constantin, he sold jewelry belonging to Vickie Constantin the same afternoon her mother was attacked, and gave away more jewelry taken from that residence to an acquaintance several days later. As in *Soper*, *Alcala*, and *Miller*, this evidence supports a conclusion by a preponderance of the evidence that defendant was the perpetrator in each crime.

For these same reasons we reject defendant's further claim that even if the trial court's denial of the severance motion was correct when made, it produced in hindsight " ' "a gross unfairness . . . such as to deprive the defendant of a fair trial or due process of law." ' " (*Zambrano*, *supra*, 41 Cal.4th at p. 1130.) Indeed, the jury found defendant not guilty of the attempted murders of Bessie Herrick and Ruth Durham, and the robbery of Pearl Larson, demonstrating it carefully reviewed the evidence for each individual count.

### B. Guilt Phase Issues

#### 1. Removal of Juror R.A.

Defendant contends the trial court erred in removing Juror R.A. for cause in violation of section 1089 and defendant's rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, sections 15 to 17 of the state Constitution. We disagree.

#### (a) Factual background

On February 24, 1992, one of the jurors informed the court by telephone that Juror R.A. had smelled of alcohol during the trial the previous week. The following morning, the court and counsel met in chambers with the juror who had made the allegation, and, at the end of the day, with Juror R.A. The court said to R.A., "It has been brought to my attention that one or more members of the jury may have consumed alcoholic beverages during the course of one or more of the court days last week . . . . I am going to talk to other people, but I need to ask you a question or two. . . . Have you or to your knowledge have any other members of the jury had anything alcoholic to drink during the course of the court day itself?" R.A. replied, "No way." The court said, "All right," thanked R.A., and ordered him not to speak to any person about their discussion. After further exchange between the court and Juror R.A., R.A. said he had been involved in a number of arbitrations, and had been told at the outset, "no way you guys go out and consume alcohol in an arbitration case. This is the first time I ever heard of something going on in a superior court." The court responded, "This may well be something not going

on. I'll tell you, in all candor, we talked to others, [we] may be talking to other people. That's why we try to do it individually and without disrupting things, and we're not singling out any individuals . . . . That's why we wanted to be somewhat discreet about it." After further colloquy between the court and R.A., the court thanked him once again, said they would see him in the morning, and R.A. said, "Okey dokey."

After Juror R.A. left, the court said Juror R.A. appeared shocked at the allegation, and appeared "cold stone sober." It also noted that it had observed R.A. throughout the day, and at one point during the playing of a video stood next to him, and "observed nothing out of the ordinary. . . . As far as I'm concerned, there is absolutely nothing or no basis at this stage that I can see whereby I could find that he is unable to perform his duties or just anything other than to accept his statement that he is not drinking." The court concluded, "From everything I have been able to see, he's at least as attentive as others. As far as I'm concerned, this is the end of the matter." Neither party disagreed.

On February 26, the morning following the conference in chambers, Juror R.A. told the bailiff "he was somewhat upset about the subject" of the conference, and noted "he had felt some embarrassment and was concerned about that." The court immediately notified counsel, and the decision was made to speak with R.A. the next day.

The following morning, at the conference in chambers with Juror R.A., the court told him that it wanted to "assure you that there wasn't, and there is no intent on my part to embarrass you or any other member of the jury, nor is there any intent to suggest in any way that I, or anybody else, thinks for a single minute that you cannot continue to serve as a trial juror in this case. I am sure you can understand I have a duty to make an inquiry when I receive certain information, even though that information proves to be completely inaccurate. These things happen all the time, and you were not the only juror to whom we spoke. . . . I and all counsel have every confidence that you will continue to follow the oath that you took, and that you will be able to render a just verdict on this case, based solely on the evidence presented in accordance with the court's instructions." The court reminded R.A. not to speak to anyone concerning the matter, thanked him, and apologized "for any confusion or embarrassment that I may have caused you." It then said, "We're now going to recess this proceeding and reconvene in open court."

Juror R.A. said, "Do you mean I don't have a say?" The court said, "What would you like to say?" R.A. responded: "When I left your chambers Tuesday, I was furious, I was furious. Someone made an allegation against me, I don't know who it was. The thing I was most concerned with was the

fact that in the—in the past, when it came to serving any type of jury trial, I felt that if the defendant did not want to get up on the stand, and look his accuser in the eye and say, 'I did not do it,' I was prejudiced against him. That automatically made me think, if he did not want to get up here and do it, I automatically thought it was, you know, I would be prejudiced against the case. And here, something had occurred, I don't know when, where, how, but somebody, in my mind, made an accusation against me. And I cannot look that same person in the eye and say, 'Hey, wait a minute, this, you know, this did not occur and I want to know why you're making these allegations against me.' And it's really kind of shaken my faith as far as, I guess, proceedings down here in this building. I have been called for jury trial in the past 15 years, I guess. And this is the first time that I have felt that I wouldn't be able to serve—well, objectively, without any, you know, prejudices or anything else, this is one of the first cases. And to be honest with you, I really am kind of shaken by this."

The court asked Juror R.A., "Feeling as you do, can you think of any reason why you wouldn't be able to continue to participate as a member of the jury?" R.A. replied: "I don't know if someone in that jury room upstairs made these comments—but I don't know if it was, you know, a member of counsel. I don't know if it was a member of the clerk, or bailiffs. I don't know who made this comment, but I am—I am shaken by this, I really am." The court assured R.A. it was no one in the room, "but beyond that, as I say, you're not the only person we talked to." After further comments, it said, "The important point is that you have to be able to focus in on your oath that you took earlier, and you have to be able to participate as a member of this jury, listen to the evidence, whatever is presented." It delineated a juror's obligations at trial, including deliberating with the other jurors. R.A. said, "That's the entire point. I have to sit with eleven other people and one person that I don't know or know of, made these allegations. And that's the tough point about it." The court subsequently asked, "[W]hy should what has happened prevent you from carrying out your role as a trial juror in this case?" R.A. responded, "Maybe one of those eleven people up there that I am serving with has some kind of comment or allegation against me personally, I know did not occur. And I just, I could not—boy." The court asked, "Well, let me ask you this, do you think this is going to cause you to perhaps not, you know, not decide this case based just on the evidence?" R.A. replied, "It may possibly be so."

After further colloquy between the court and Juror R.A., and comments by defense counsel, defense counsel said, "[M]y bottom-line question is, when you get in deliberations, whatever may or may not have occurred, whatever your feelings may or may not be, could you decide what the facts are and apply them to the law, based on your own independent judgment here in

court?" R.A. replied, "Regarding Mr. Lynch's trial, yes, I could. But as stated earlier, there's some sort of a thing going on here now."

After a comment by defense counsel to Juror R.A., the court observed, "Your job is to decide [defendant's] guilt or innocence of these charges." R.A. said, "I realize that, your honor but—I am just being honest with you, that's all. I just wanted to let you know there is something there that does just not set right with me, okay?" The court said, "I can understand why you are upset. I can understand why you feel you were embarrassed and humiliated by this accusation. You can understand why we had to take the action we took. But the question now is, can you put that behind you and can you focus in on your duty as a juror, or is it going to prevent you from doing so? I need your assurance, we all need your assurance that you will be able to focus on your oath, and that you will be able to make a determination as to the appropriate verdict in this case, based only on the evidence, and that you're not going to let this experience interfere with that." R.A. responded, "You mentioned the 'focus' part, and that is this thing I don't think I would be able to do." The court said, "I don't want to put words in your mouth, but are you saying this experience is somehow going to be . . . of such a nature it will prevent you from paying attention to the evidence?" R.A. replied, "Once again, the word 'focus.' " The court said, "Can you assure us that you will be able to render a verdict in this case based solely on the evidence that's presented?" R.A. responded, "I'd make it my utmost to try, utmost attempt, but I would want both counsel to know that I do harbor a lot of resentment right now at this time, not at either counsel. I just want to let it be known that I, in these proceedings, do harbor a lot of resentment." The court asked, "[I]s that resentment going to interfere with your duty as a juror as you understand it? You're the only one who can answer that question." R.A. responded, "Once again, I would make the utmost attempt not to let it occur." After further colloquy with the court, R.A. said, "I would like to know. I realize it can't be done, okay. That's a tough thing for me, it does not sit well." The court inquired whether there was anything else R.A. would like to say, specifically with regard to "whether or not you would be able to continue as a trial juror in the case?" R.A. responded that he was "rather shaken" by the February 25 in-chambers conference. He added, "I did not think things like that would actually occur." The court responded that such situations were not unusual, gave examples, and said, "We have done everything we can to not single out anybody."

Juror R.A. referred to his experience in labor negotiations, noting, "I know the rules, they were very clear back then. And that's what is most upsetting to me, that someone accused me of violating those rules." The court said, "I am not going to even indicate that anything rises to the level of an accusation against you or any individual juror. . . . All I can tell you is that I received certain information that I shared with you. That information triggered a query

on my part. We have talked to you. You're not the only person we have talked to. It has embarrassed you." The court mentioned they had waited 24 hours to speak with R.A. so that he could calm down, "[b]ut here we are. . . . [T]he concern is whether you will be able to continue to serve as a juror. It would be my expectation that you would do so." R.A. responded, "Gentlemen, I just want to let you both know that . . . as far as the case that we are hearing right now, I will still try to be as fair and subjective [*sic*] as possible. But I just want both counsel to know that I just feel a bit tainted, okay." The court assured R.A. he should not feel that way, and said, "[T]he bottom line . . . is whether you will be able to participate and listen to this evidence and then make a decision as to what did or didn't happen." R.A. responded, "I give it one hundred percent. That's all I could say."

Defense counsel assured Juror R.A. he thought he would be fair and impartial. The prosecutor agreed that absent R.A. telling them he could not proceed, he saw no reason to disqualify him. After further comments by the court as to why they were speaking to R.A. a second time, the court asked if he had anything else to say. R.A. said, "Well, I guess the bottom line is my integrity, I felt, was compromised greatly, and that's the only thing I've got. I don't have kids, I don't have property, and that's the only thing I've got left . . . . [¶] . . . [¶] . . . [I]f [my job] is here a year from now, I would be greatly surprised. So, that's the way I feel. . . . [M]y integrity is the only thing I have and I feel it was compromised." The court assured him no one in the room felt that way, and they had the "utmost confidence" he could continue as a juror. "The only thing that we wanted to be sure of was that this . . . challenge to your integrity, as you view it, because that is what is important, your view of the situation, does not take on a life of its own, so it overshadows your job as a trial juror." R.A. said, "That was my concern, and why I made comments to [the bailiff] yesterday." The court said, "We want to be sure you will be able to give both sides in this trial a fair trial, notwithstanding this incident." R.A. said, "I will give it one hundred percent, gentlemen."

After Juror R.A. left, the prosecutor said, "We can talk all the platitudes we want with him here, but I am getting a little concerned." The court responded, "It concerns the court, as well." The prosecutor continued, "I mean, he said something along the line[s] [of] if Lynch doesn't take the stand, he will be prejudiced." Defense counsel said, "That scared the daylights out of me." The prosecutor said, "I don't know how to take that attitude, plus the fact he might not focus. I am very close to asking him to be replaced, seriously." Defense counsel subsequently noted that he did not anticipate that defendant would testify in the guilt phase.

The court suggested counsel reflect on the matter, and the prosecutor stated that he wanted to review a transcript of the hearing before deciding whether

to make a challenge. The court also noted Juror R.A.'s comments might be "of concern to a defendant who is not going to testify." Defense counsel said, "I think that's valid, your honor. I want to consider it." He observed, however, that R.A. was one of three Black jurors, and "with the cross-racial identification issues," that was also a factor he had to consider. "So, I am not in a position to make a motion or give an answer at this time, either." The court stated that as far as it was concerned, the matter was closed unless "brought to my attention either by way of a challenge or stipulation."

On March 3, the prosecutor challenged Juror R.A. for cause. The prosecutor recounted some of R.A.'s statements at the February 27 hearing. He also stated R.A. appeared uninterested the afternoon of February 27 because he had his head down and eyes closed for six minutes during defense counsel's cross-examination of a witness. Defense counsel stated that he had not observed the juror because he was conducting the cross-examination, but agreed the prosecutor had immediately brought the matter to his attention. Defense counsel also noted that R.A. had seen defendant in chains and shackles on one occasion. Defense counsel stated he had discussed the matter at some length with defendant and cocounsel, and was "very personally concerned" with R.A.'s comments on the Fifth Amendment. Defendant, however, had instructed defense counsel, who found "no reason to quarrel," that he was not to join in a stipulation to the challenge. Counsel also noted R.A.'s statements that he would be fair and give it 100 percent, and the benefit of having a Black juror when there was an issue of cross-racial identification. He objected to the challenge.

The trial court sustained the prosecutor's challenge, stating: "[T]he juror was shaken and furious at this inquiry concerning possible misconduct. He said that he possibly suspected another juror of being the source of this, and indicated some doubt as to whether or not he'd be able to trust a person in that situation. He did, as the district attorney pointed out, say that he might be unable to decide the case solely on the evidence. He does not think that he would be able to focus solely on the evidence in reaching a verdict. He harbors lots of resentment, although he did say he'd try to be as fair as possible to this. And to this record must be added the court's observation of his demeanor both in and out of chambers. While in chambers, he appeared very upset and visibly shaken and angry. It had been my hope and my intention at the time of the second session with him in chambers simply to reassure him that no one thought him guilty of misconduct. Frankly, I hoped it was going to be a monologue, but he would not let go. I think his words were something to the effect: 'Don't I get to say anything?' When I, in effect, asked him to return to the jury room, and at that point, we were off and running. As I feared, this incident has taken on a life of its own. During sessions in court following the second in camera with him, he, at times, did not appear to be paying attention. Rather, he would sit with his arms folded

and stare straight ahead not looking at the witness who was testifying or at counsel as they asked questions. At other times, he appeared to have his head down. In fairness, most of the time during the presentation of evidence he did seem to act appropriately. In conclusion, I'm satisfied that cause exists to excuse [Juror R.A.] in that his state of mind is such that I have grave concerns and doubts that he will be able to act with entire impartiality and without prejudice to the substantial rights of either party. Accordingly, the challenge is allowed." The court and parties agreed R.A. would be removed at the end of the day.[15]

(b) *Analysis*

 "Section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.' "[16] (*People v. Bennett* (2009) 45 Cal.4th 577, 621 [88 Cal.Rptr.3d 131, 199 P.3d 535].) "A juror's inability to perform ' "must appear in the record as a 'demonstrable reality.' " ' " (*Ibid.*; see *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052–1053 [63 Cal.Rptr.3d 82, 162 P.3d 596].) We review the trial court's decision for abuse of discretion. (*Barnwell*, at p. 1052.)

Here, the trial court promptly and thoroughly investigated reports first that Juror R.A. smelled of alcohol, and then that he was embarrassed and upset as a result of the trial court's inquiry regarding the allegations of alcohol use. At the second in camera hearing following the report of R.A.'s negative emotional state, the court assumed its initial comments to Juror R.A.—telling him there was no intent to embarrass him, these types of investigations are commonplace, and that the court and counsel had complete confidence he was a qualified juror—would allay his concerns. When this assumption failed, it exhaustively examined R.A. regarding his capacity to set aside the incident and focus on defendant's case. R.A.'s responses indicated that although he would make his best effort, he nevertheless "harbor[ed] a lot of resentment," was concerned he would not be objective and would have difficulty focusing on his oath and on his duty as a juror, and said he felt "tainted," "shaken," and that his integrity had been "compromised greatly." Moreover, although

---

[15] Juror R.A.'s removal does not appear in the record, but on the morning of March 5, 1992, which was the next day after March 3 that the jury was in court, an alternate juror was directed to join the jury in his place.

[16] Section 1089 provides in relevant part, and at the time of trial provided in substantively similar language: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

the trial court deliberately waited one day to speak with R.A. so that he would have an opportunity to regain his composure, at the hearing he "appeared very upset and visibly shaken and angry." Then, at court sessions after the second hearing, R.A. appeared at times to the court to be disengaged from the proceedings. Under these circumstances, the trial court acted within its discretion in finding Juror R.A. was unable to perform his duty as a juror. (See *People v. Marshall* (1996) 13 Cal.4th 799, 845–846 [55 Cal.Rptr.2d 347, 919 P.2d 1280] [no abuse of discretion in discharging a juror on whose behalf the district attorney's office had refused to intercede regarding a speeding ticket, when the juror said the ticket if upheld would cost him his job, and that he would feel distracted and " 'wonder where justice was at' " if the ticket were not dismissed]; *People v. Lucas* (1995) 12 Cal.4th 415, 489 [48 Cal.Rptr.2d 525, 907 P.2d 373] [no abuse of discretion in discharging a juror who stated cancellation of her vacation would not affect her performance as a juror, but whose behavior and demeanor demonstrated the contrary].)

### 2. *Defendant's absence from certain proceedings*

 Defendant contends he was absent from 14 proceedings in violation of sections 977 and 1043, and his rights under the Fifth, Sixth and Fourteenth Amendments to the federal Constitution. Four occasions primarily involved jury selection procedures, as well as brief discussions of an exhibit for any renewed change of venue motion, the effect of a recent decision by this court, and an observation that the trial court had signed an order releasing two exhibits to the prosecutor's investigator. Two occasions involved in-chambers hearings to discuss counsel's concerns that the media were creating a distraction while witnesses were testifying. Four occasions involved the in-camera hearings regarding Juror R.A. Defendant was absent from proceedings on March 4, 1992, which involved the admission of trial exhibits, discussion of the guilt jury instructions, argument on the admissibility of a television interview with the Herricks, and argument on the motion for judgment of acquittal. Defendant was also absent from a March 24, 1992, in-chambers discussion that was never reported, but apparently involved discussion of the verdict on the counts involving Pearl Larson's death, and the penalty jury instructions. Finally, defendant was absent from an in-chambers conference held in response to a jury question during guilt phase deliberations and a hearing in which penalty jury instructions and exhibits were discussed. On all of these occasions, defense counsel expressly or impliedly waived defendant's presence.

"Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' " (*People v. Butler* (2009) 46 Cal.4th 847, 861 [95 Cal.Rptr.3d 376, 209 P.3d

596] (*Butler*), quoting *Kentucky v. Stincer* (1987) 482 U.S. 730, 744–745, fn. 17 [96 L.Ed.2d 631, 107 S.Ct. 2658].) In addition, a defendant has a due process right "to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." (*Kentucky v. Stincer*, at p. 745.) "Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him." (*Butler*, at p. 861.)

Here, as to three of the four hearings involving Juror R.A., defendant merely asserts that had he attended the first hearing at which the court and counsel discussed an allegation that Juror R.A. smelled of alcohol, he could have assisted in the process by "watching the juror, observing his conduct and reporting back to trial counsel." As to the second hearing, when the court questioned Juror R.A. as to whether he was aware of any alcohol use by the jury, defendant asserts that "[h]aving someone of [R.A.'s] own race present might very well have helped [R.A.] feel less threatened by what he later perceived to be an accusation which he took personally." Finally, as to the third hearing, in which the court and counsel explored Juror R.A.'s reaction to the allegation of alcohol use, defendant asserts that had he been "[g]iven the opportunity to express his feelings about the juror immediately, [defendant] would have arguably had a greater influence on his attorney when the time came to make the case for retaining [R.A.] on the jury." For all of the remaining challenged hearings, defendant makes only conclusory assertions that "many of the hearings from which [defendant] was excluded[] were ones where his presence would have been useful, and both a benefit to himself and to his counsel," or that he "could have played an active role by offering his views, participating in the process and influencing the outcome of the decisions." None of these assertions amount to "more than speculation." (*People v. Harris* (2008) 43 Cal.4th 1269, 1307 [78 Cal.Rptr.3d 295, 185 P.3d 727].)

Nor, having examined the proceedings, do we see any basis for concluding that defendant's personal presence was necessary for an opportunity for effective cross-examination, would have contributed to the trial's fairness, or bore a reasonably substantial relation to the fullness of his opportunity to defend the charges against him. (*Butler, supra*, 46 Cal.4th at p. 865 [voir dire procedures are "not a critical stage for purposes of a defendant's constitutional and statutory rights to be present"]; *People v. Box* (2000) 23 Cal.4th 1153, 1191–1192 [99 Cal.Rptr.2d 69, 5 P.3d 130] [there was no constitutional or statutory violation from the defendant's absence at hearings involving legal argument on evidentiary questions]; *People v. Riel* (2000) 22 Cal.4th 1153, 1196 [96 Cal.Rptr.2d 1, 998 P.2d 969] [the defendant's presence at discussions of television coverage, jury instructions, or which exhibits to send to the jury "would neither have contributed to the fairness of the procedure nor

have affected the fullness of his opportunity to defend against the charges"]; *People v. Waidla* (2000) 22 Cal.4th 690, 741–742 [94 Cal.Rptr.2d 396, 996 P.2d 46] [the defendant had no right to be personally present at hearings involving procedural, evidentiary, and housekeeping matters, and a discussion of jury instructions]; *People v. Wharton* (1991) 53 Cal.3d 522, 602–603 [280 Cal.Rptr. 631, 809 P.2d 290] [the defendant's personal presence was not required to ensure a fair and impartial trial at hearings in which a juror was questioned concerning a conversation she had with a former district attorney's office employee, another juror was questioned regarding his attendance at a planned retirement dinner for a prosecution witness, and on two occasions to discuss possible responses to notes from the jury].)

### 3. *Asserted evidentiary errors*

#### (a) *Admission of Anna Constantin's statements*

Defendant contends the trial court erred in admitting the statements of Anna Constantin to her daughter Vickie Constantin[17] as a spontaneous utterance. (Evid. Code, § 1240.)[18] We conclude the trial court erred in admitting the statements, but that there was no prejudice under any standard.

#### (1) *Factual background*

As recounted above, on August 13, 1987, about 5:45 p.m., Anna was discovered by her daughter Vickie and taken to the hospital. In Vickie's taped interview with police the following day, on which the trial court relied in ruling that Anna's statements to Vickie were spontaneous, Vickie said her mother was "very lucid" when Vickie discovered her. Vickie asked her mother "what happened," and Anna told Vickie she had been beaten. Vickie asked how, and Anna said he "came from behind and hit me . . . he put something over my head and he beat me up." On the ride to the hospital, Anna was in too much pain to say anything. At the hospital, Anna further described the attack to Vickie, noting she had taken out one bag of garbage, and then a second bag, decided to feed the dogs, and then to water the front yard while the dogs were eating. After 10 to 15 minutes of watering the lawn, Anna heard the dogs barking. She locked the dogs in the kitchen, and

---

[17] Because Anna and Vickie Constantin shared the same surname, for clarity we refer in this part of the opinion to these individuals by their first names.

[18] Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

"(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

returned downstairs. As she approached the utility room downstairs, she was hit from behind. The assailant then tripped her and she fell. The man kept striking her, and put his foot on her neck. He obtained a heavy object, sat on Anna's back, and started beating her again. He spoke rapidly, but she did understand "fuck you" and "I'm going to kill you." The assailant threw a blanket over Anna's head and tied her hands. He then ransacked the house. Anna was not tied up when Vickie discovered her. Vickie told police, "She . . . got untied and she crawled to the door." Anna died on September 28, 1987.

At the preliminary hearing, which occurred after Anna's death, the prosecutor sought to question Vickie regarding Anna's statements to her on August 13, 1987, the day Anna was attacked. Defendant objected on hearsay grounds. Vickie testified in limine that she spoke with her mother by telephone at noon on the day of her attack. She also observed that her mother generally took the garbage out after 2:00 p.m., and that the garbage had been taken out on that day. In addition, her mother fed the dogs every day at 4:00 p.m.

About 5:45 p.m., Vickie arrived home from work and discovered her mother badly beaten. She called 911. Vickie attempted to question her mother in the ambulance, but Vickie said Anna was in too much pain to answer and told her, "I will talk to you later." Vickie described her mother as not "crying, but she was making little noises," which she characterized as "moaning, groaning." After arriving at the hospital, Vickie questioned her mother regarding how she sustained her injuries. The municipal court sustained defense counsel's objection to Anna's responses because the evidence merely established the attack occurred sometime within a three-hour-45-minute time period before the statements were made, and this was insufficient to permit the court to find the statements had been made without the opportunity to reflect.

Dr. Chuc Van Dang, Anna's treating physician at the hospital, testified that when he examined Anna about 6:00 p.m. on August 13, she was "dazed," but able to indicate to him where she was experiencing pain. He opined that based on information provided apparently by Vickie, which was not described, and Anna's lowered blood count, her injuries had been inflicted one to two hours before she was examined; based solely on his observations, he opined that they were inflicted two to six hours before.

At trial, the prosecutor again moved to introduce Anna's statements under Evidence Code section 1240. Defendant opposed the motion. At the hearing on the motion, the prosecutor asked the court to take judicial notice of the preliminary hearing testimony of Dr. Dang, who treated Anna at the hospital.

The parties also referred to, and the court was familiar with, Vickie's August 14, 1987, statement to the police recounted above. The trial court ruled: "[T]he statements to the victim's daughter were made some time after she was attacked, between one and two hours according to the statement of Dr. Dang. I've considered the timing of the statements, as well as the fact they were the result of the daughter's questions about what happened. I've considered all of the circumstances as shown in the moving papers. In the court's view, the statements to her daughter at the hospital by this victim were made at a time when [Anna] was under the influence of the attack. She'd been moaning and groaning in the ambulance on the way to the hospital. She was not merely an uninjured witness whose excitement might wane and would thus be in a position to fabricate the answers. The responses were not self-serving. In the exercise of my discretion, I'm satisfied the People have met their burden and will be able to establish a foundation for the admission of the statements at trial."

During trial on February 27, 1992, but before Vickie Constantin testified, defense counsel, "out of an abundance of caution," observed that the court had previously ruled that Vickie could testify to what her mother said to her on August 13, 1987. Counsel expressed concern that Vickie might testify regarding statements her mother made in a later interview on September 2, 1987. In order to ensure that Vickie would be recounting statements made by her mother on August 13, not September 2, the court had her testify in limine.

On voir dire, Vickie said that after discovering her mother and calling 911, she asked her mother what happened. Anna said, apparently in Russian, that "she was attacked by a man and beaten savagely." Vickie asked her, "[H]ow did it happen?" According to Vickie, Anna said that when "she heard the dogs barking, . . . she remembered that she had left the back door open, but the screen closed. So, she went downstairs to shut the back door, and as she went downstairs into the utility room to shut the back door, she was attacked from behind." The prosecutor asked how Anna described the attack. Vickie said, "She was hit on the back of the head with something very heavy, very painful. She did not go down immediately. As a result, this person kicked, tried to kick the back of her legs to get her down and then more punching and more hitting." The prosecutor asked, "Did your mother ever tell you she eventually fell to the floor?" Vickie said, "Yes." The prosecutor asked, "Did she ever say what happened to her while she was on the floor?" "She said she tried to get up and she tried to look around at her attacker. At that point, she said that he put a foot with his shoe on her neck and face, to keep her from looking at him." The prosecutor asked, "Did she ever say anything as to what this attacker of hers was saying at the time, if anything?" Vickie said, "He talked very rapidly. The words she understood w[ere], excuse me, 'Fuck you, bitch, I'll kill you.'" The prosecutor asked, "Did your mother ever tell you that she could recognize the voice or accent of the person as to his race?"

Over defense counsel's objection, Vickie answered, "My mother said it was her opinion that this person was Afro-American, because of his accent and his voice."

The prosecutor established that at some point emergency personnel arrived and transported Anna to the hospital. Vickie testified that at the hospital, Anna finished the story of what had happened to her. "She said while she was down and being beaten, for quite a long time, very viciously, she kept asking 'Why, why,' and that provoked more savagery. After that, she said that he got up—he actually sat on her because she still kept trying to get up, and he sat on her and proceeded to pound against her head and her face. He got up after, when she stopped struggling, went over and got . . . a blanket and put it over her head or over her. Then he got an electrical cord and tied up her hands." The prosecutor asked, "Did she say what she could hear happening in the house at this point?" Vickie said, "At that point he went upstairs and was ransacking the house, looking around." The prosecutor then asked, "Did she ever indicate whether or not this attacker of hers came back to her?" Vickie said, "He left by the back door. As he was leaving, she said that, I am not quite sure if she made a movement or whatever, but he beat her some more on the way out."

On cross-examination, Vickie was asked, "[W]hat you told us here, were these exact, verbatim translations of what your mother said to you?" Vickie answered, "Yes." Defense counsel asked, "Your mother specifically used the words 'Afro-American?' " Vickie said, "She used 'Black.' " Defense counsel subsequently asked, "Did she say she was aware it was electrical cord that was being wrapped around her, or is that something you surmised?" Vickie responded, "That is what I found lying by her." Defense counsel said, "My questions, Ms. Constantin, deal with what exactly your mother told you in the conversation. Did your mother tell you she was bound by an electrical cord?" Vickie answered, "If that is what I said in the testimony, then that is what I meant to say. That is what she told me."

At the end of the hearing, the court inquired, "I just want to make sure I understood your testimony. The statements of your mother that you have testified to this afternoon were statements that were made upon your discovery of her at your home and that same evening at the emergency room?" Vickie said, "Yes." The court ruled, "I will permit the witness to testify. Again, I believe that the People, we're anticipating by the way, Dr. . . . Dang's testimony as part of this,[19] and I am satisfied the People will be able to establish the foundation for the admission of this testimony under [section]

---

[19] This presumably is a reference to Dr. Dang's opinion testimony at the preliminary hearing that based on information provided apparently by Vickie, which was not described, and Anna's lowered blood count, her injuries were inflicted one to two hours before she was examined.

1240, so she will be allowed to testify." Defense counsel noted his "continuing objection to what the court has ruled upon as a spontaneous declaration."

Later that day in front of the jury, Vickie testified to similar details as she had on voir dire, but now said that nearly all of the statements by her mother, most or all of which were in Russian, were made while they were still at the house. At the hospital, Vickie testified that Anna merely said that after the assailant beat her a second time, he went upstairs and ransacked the house, she heard the dogs trying to fight him, he came downstairs, beat her some more, and left. In addition, while discussing the statements made while the Constantins were still at home, Vickie related statements by her mother that were not in her earlier in limine testimony. These included her mother's statements that after taking out the garbage twice, she had fed the dogs. While the dogs were eating, she went outside to water the front yard. She then heard the dogs barking ferociously, and so she locked them upstairs. In addition, the prosecutor asked, "After the person had come back . . . and began beating her some more, did your mother ever indicate what she was struck with at that point?" Vickie responded, "She believed she was struck with the iron, the clothes iron." The prosecutor also asked, "Did your mother ever say anything with respect to a paint can?" Vickie responded, "I asked her . . . was that blood on her or paint and she said it was both." He also asked, "Did your mother ever tell you how she got untied [¶] . . . [¶] . . . from the electric cord?" Vickie answered, "Yes, she said she untied herself." Finally, the prosecutor asked her, "You said that the dogs were fed. Is there a time every day when the dogs were fed?" Vickie ultimately responded, "3:30."

### (2) Analysis

Evidence Code section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement" "[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant" and "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." "[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (*People v. Farmer* (1989) 47 Cal.3d 888, 903 [254 Cal.Rptr. 508, 765 P.2d 940] (*Farmer*).)

"To be admissible, '(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and

(3) the utterance must relate to the circumstance of the occurrence preceding it.' " (*People v. Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259]; see *Farmer, supra,* 47 Cal.3d at p. 903 [" 'spontaneous' " describes "actions undertaken without deliberation or reflection"].) We review the trial court's ruling admitting statements as spontaneous for abuse of discretion. (*People v. Ledesma* (2006) 39 Cal.4th 641, 708 [47 Cal.Rptr.3d 326, 140 P.3d 657] (*Ledesma*).)

■ Because the second admissibility requirement, i.e., that the statement was made before there was " 'time to contrive and misrepresent,' " "relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met." (*People v. Poggi* (1988) 45 Cal.3d 306, 318–319 [246 Cal.Rptr. 886, 753 P.2d 1082] (*Poggi*).) In considering admissibility under this requirement, the court considers a variety of factors to determine the mental state of the declarant. (*Farmer, supra,* 47 Cal.3d at p. 903 [the "crucial element in determining whether a declaration is sufficiently reliable to be admissible" is not the "nature of the statement but the mental state of the speaker"].) These factors include the length of time between the startling occurrence and the statement, whether the statement was blurted out or made in response to questioning, how detailed the questioning was, whether the declarant appeared excited or frightened, and whether the declarant's "physical condition was such as would inhibit deliberation." (*People v. Raley* (1992) 2 Cal.4th 870, 894 [8 Cal.Rptr.2d 678, 830 P.2d 712] (*Raley*); see *Ledesma, supra,* 39 Cal.4th at p. 709; *Farmer,* at pp. 903–904.)

Here, defendant contends that the "circumstances surrounding the statements Vickie purportedly obtained from her mother did not support a finding that the statements were sufficiently reliable to be admitted against" defendant. He relies on the length and detail of Anna's statements, which he asserts "belie[] the state of 'nervous excitement' required for a spontaneous declaration." He also notes that Vickie's account of what Anna said, and where she said it, varied each time Vickie made a statement to police or testified, and contends an excited utterance is "brief and simple enough that a person hearing the statement" can recall exactly what was said.

■ We have upheld the admission of statements containing more detail than that which would be precisely recollected when other factors suggest the statements were made while the declarant was in an excited state. Thus, in *Farmer,* we concluded that the trial court did not err in admitting both a shooting victim's statement to a police dispatcher and his subsequent conversation with a police officer at his home. (*Farmer, supra,* 47 Cal.3d at p. 904.) The officer found the victim, who had been shot three times in the mouth and

stomach, bleeding but conscious and talking on the telephone. (*Id.* at pp. 902–903.) He knew his assailant, but could not remember his name. In response to specific questions—which were interrupted "moment to moment" because of the "victim's obvious pain"—the declarant described "the man's race, weight, height, and age," and said that he was a customer of his roommate. He also described how the shooting occurred. (*Id.* at p. 903.) The victim died several hours later. (*Id.* at p. 899.)

Although we noted in *Farmer* that "we have rarely held the answers to such extensive questioning to be spontaneous utterances," we concluded that in that case there was "no doubt" that the declarant was "excited, or perhaps more accurately, distraught and in severe pain." (*Farmer, supra,* 47 Cal.3d at p. 904.) In addition, his "responses were not self-serving," nor were "the questions suggestive." (*Ibid.*) "While he was being questioned, the intense pain of his gunshot wounds and the concern he rightfully had about his survival no doubt preoccupied him so that he could not have contemplated spinning a false tale. In sum, he had so little opportunity and incentive to deliberate that under these unusual circumstances we can dispense with the testimonial requirements of an oath and cross-examination." (*Ibid.*)

Likewise, in *Poggi, supra,* 45 Cal.3d 306, the declarant was questioned by police in her home about a half hour after she was attacked. (*Id.* at pp. 315–316.) When the officer arrived, the declarant "expressed a belief that the perpetrator might still be in the house." (*Id.* at p. 316.) She was in a "very excited state" and, although apparently attempting to recount what had happened to her, "rambling and incoherent." (*Id.* at p. 315.) Because of her lack of clarity, the officer attempted to "draw information from her by asking what happened; she showed him that she was bleeding profusely from several wounds to her chest; during questioning she remained excited and several times had to be told to slow down and to become calm; his questioning lasted between 15 and 20 minutes—almost all of it while paramedics were attempting to treat her wounds." (*Id.* at p. 316.) She told the officer that the "perpetrator was a stranger; he came into her home; he had a knife; he took about $90; he beat her up; he raped her in her son's bedroom; he forced her to fill the bathtub, said he was going to drown her, and attempted to do so; they fought in the tub, and he was unsuccessful; he then said, 'I gotta stab you. You gotta die,' and he stabbed her; she first identified her attacker as Black or very dark complected and subsequently answered yes to a question whether he could be Mexican." (*Ibid.*)

On appeal, we upheld the admission of these statements as spontaneous under Evidence Code section 1240. (*Poggi, supra,* 45 Cal.3d at pp. 317–318.) We observed, "First, although [the declarant] made the statements at issue about 30 minutes after the attack, it is undisputed that she was still under its

influence. Second, it is also undisputed that she remained excited as she made the statements, even though she had become calm enough to speak coherently. Finally, the fact that the statements were delivered in response to questioning does not render them nonspontaneous." (*Id.* at pp. 319–320.) We noted that with one exception, the questions were simple and nonsuggestive. (*Id.* at p. 320.) As to the question whether the attacker could be Mexican, we held that in view of the declarant's "emotional and physical state—she was excited and bleeding profusely from multiple and ultimately fatal stab wounds to the chest—we cannot say that the questions rendered her response 'reflective.' " (*Ibid.*)

Here, as in *Farmer* and *Poggi*, Vickie's questions do not appear suggestive, or Anna's responses self-serving. Nevertheless, unlike in these cases, Anna's description of the attack is far more comprehensive, and inclusive of detailed descriptions of such nonessential matters as her engagement in routine household chores. (See *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1525 [50 Cal.Rptr.3d 110] [the "narrative style as well as the quantity, detail and content of [the declarant's] statements suggest that they were not spontaneous statements . . . but rather, that they were made after [the declarant] had engaged in a deliberative or reflective process"].) Nor does it appear Anna blurted out the statements, but rather made them in response to questioning. Moreover, it appears Anna made the statements an hour or two after receiving her injuries. Most critically, no testimony by Vickie or Anna's attending physician demonstrates that, like the victims in *Farmer* and *Poggi*, Anna was excited or frightened when she spoke, or that her physical condition at the time of her statements precluded deliberation. (*Ledesma, supra,* 39 Cal.4th at p. 709 [the trial court's conclusion that the declarant was under the "stress of the event at the time he made the statements" was supported by observations that he "seemed nervous" and "sounded scared"]; *Raley, supra,* 2 Cal.4th at pp. 893–894 [noting that the physical condition of the declarant—a "young woman who had been bleeding for 18 hours" and was unconscious for part of this period, "suffered a traumatic head injury," and who was close to death—"was such as would inhibit deliberation"].) Although none of these factors in isolation deprive Anna's statements of spontaneity, they collectively appear to demonstrate that her mental state while describing the attack was thoughtful and reflective. The trial court therefore abused its discretion in admitting the statements as a spontaneous utterance under Evidence Code section 1240.[20]

---

[20] Defendant further contends that Anna's statements at the hospital violate *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] because they were made to a police officer, and therefore are testimonial. The Attorney General states that a "police detective was present and attempted to record the conversation between Anna and Vickie."

Although a police report contained in the clerk's transcript states that an officer interviewed Anna about a half hour after she arrived at the hospital, and the unsuccessfully taped interview

We further conclude that this error was harmless under any standard. Although in her statement Anna identified her attacker as "Black," and said he had covered her with a blanket and tied her hands, apparently with electrical cord, circumstances common to Figuerido's murder, and said that she had fed the dogs, a circumstance that tied the attack to a particular time period, other evidence linked defendant to the crime. Thus, about 3:15 to 3:20 p.m. on the afternoon of Anna's attack, defendant was seen coming out of the hedges about a block from the intersection of Bancroft Avenue and Blossom Way where Anna's house was located, looking around, and then walking towards Anna's house. In addition, about 5:00 p.m. that afternoon, defendant sold a Russian bracelet stolen from the Constantin residence and, several days later, gave an acquaintance two necklaces that were also identified as belonging to Vickie Constantin. Moreover, even without Anna's statement, this attack bore common features with the four other attacks with respect to the time period and community in which it occurred, the race and age of the victim, its occurrence in the victim's home (which was located on a corner) during the day, the infliction of blunt trauma to her head, and the commission of robbery. Likewise, although Anna's statement recounted callous statements and actions by defendant, the jury could reasonably draw an inference of callousness based on the description of Anna's injuries by Vickie, the attending physician, and the pathologist, and the circumstance that Anna, an elderly woman, had been left alone following their infliction.

### (b) *Exclusion of evidence of third party culpability*

Defendant contends the trial court erred in precluding admission of Steven Berger's testimony concerning individuals he observed following the attack on Ruth Durham, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7 and 15 of the state Constitution. We disagree.

In his offer of proof, defense counsel said Berger "was the gentleman who first observed Mrs. Durham on her front porch. He assisted her and notified her son-in-law." When police asked Berger "if he had made any unusual observations . . . he indicated that he saw a van driving around with three male Blacks. They were laughing, or he felt they were unusual. My recollection is that . . . he observed the van either shortly after he came upon

was conducted with Anna speaking in Russian, and Vickie translating for the officer, the prosecutor in the municipal court appeared to state that he was not seeking admission of these statements. Indeed, Vickie never testified that an officer was present when her mother made the statements Vickie recounted. In the absence of such evidence, and because defendant does not assert that any statements Anna made to Vickie outside the presence of law enforcement personnel were testimonial, no *Crawford* claim appears. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 813 [89 Cal.Rptr.3d 225, 200 P.3d 847] [the "statement of a three-year-old declarant made to his aunt is more like 'a casual remark to an acquaintance' and is therefore not a testimonial statement under *Crawford*"].)

Mrs. Durham or while the initial officers were to the scene." Although other individuals had seen the van, defense counsel said he did not intend to call them.

The trial court found the evidence had "little, if any, relevance and doesn't seem to be capable of raising a reasonable doubt of the defendant's guilt. There doesn't appear to be anything that links these people to the actual perpetrator of the crimes." Under Evidence Code section 352, the court found that "any probative value that evidence has is substantially outweighed by the possibility of confusing the jury."

■ " '[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352.' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 367–368 [97 Cal.Rptr.3d 412, 212 P.3d 692].)

Here, evidence that three Black males, who were laughing (or who Berger believed otherwise appeared unusual) and were "driving around" in a van shortly after Berger found Durham injured on her porch, failed to demonstrate any link between the individuals in the van and the Durham attack, much less evidence that would raise a reasonable doubt as to defendant's guilt. Hence the trial court did not abuse its discretion in excluding the evidence.

### (c) *Asserted erroneous admission of evidence of defendant's conduct at Harvey residence*

Defendant contends the trial court erred in admitting evidence of his conduct at the home of Lavinia Harvey in violation of Evidence Code section 1101[21] and his rights under the Fourteenth Amendment to the federal Constitution. (See, *ante*, at p. 706.)

At trial, defense counsel moved in limine to exclude Harvey's testimony under Evidence Code section 1101. He asserted that the evidence was

---

[21] Evidence Code section 1101 provides:

"(a) Except as provided in this section and in [other sections], evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

dissimilar to the charged crimes because defendant merely trespassed on Harvey's property, and did not enter Harvey's home or injure her. The trial court denied the motion.

■ "Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition," such as identity. (*Ewoldt, supra,* 7 Cal.4th at p. 393, fn. omitted; see *id.* at p. 403.)

Here, evidence of the Harvey incident was relevant to prove a material fact other than defendant's criminal disposition, i.e., identity, because the common features of that incident and the charged crimes were "sufficiently distinctive so as to support the inference that the same person committed both acts." (*Ewoldt, supra,* 7 Cal.4th at p. 403.) Evidence of the Harvey incident was admissible on the issue of identity for the same reasons we previously concluded that evidence of the murders and nonfatal attacks was cross-admissible on that issue. (See, *ante,* at pp. 737–738.) Thus, Harvey and the victims in the charged crimes were Caucasian elderly women. The Harvey incident and Figuerido, Constantin, Herrick, and Durham attacks occurred during the day, and the jury could reasonably infer Larson's death also occurred during the day. In addition, the Harvey incident and the charged crimes occurred within the same two-month period in the neighboring communities of San Leandro and Hayward. The victims were attacked in their homes, and the jury could reasonably infer that absent Harvey's confrontation with defendant, she too would have been attacked inside her home. Harvey and three of the victims lived in corner homes; Durham lived next to and had regular access to her daughter's corner home; and Figuerido's home was separated from the next building on the left by an empty half-acre lot. Defendant was identified at or near Harvey's home and each victim's home for each incident.

Nor did the evidence contravene Evidence Code section 352. (*People v. Davis* (2009) 46 Cal.4th 539, 602 [94 Cal.Rptr.3d 322, 208 P.3d 78]; *People v. Kipp* (1998) 18 Cal.4th 349, 371 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; *Ewoldt, supra,* 7 Cal.4th at p. 404.) The tendency of the evidence to show identity, as

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

set forth above, was strong. (See *Ewoldt, supra,* 7 Cal.4th at p. 404.) Moreover, Harvey's account was independent of the evidence of the charged crimes. (*Id.* at pp. 404–405.) She initially investigated defendant's presence on her property because she thought he was a child about to steal tools from the open garage. Nothing in her testimony indicated that when she spoke with police the same day she encountered defendant she was aware that elderly Caucasian women in her area were being attacked in their corner homes. Nor was the probative value of this testimony substantially outweighed "by the circumstance that defendant's uncharged acts did not result in criminal convictions." (*Id.* at p. 405.) Harvey's testimony describing defendant's conduct was far less inflammatory than the testimony concerning the charged offenses, which involved brutal assaults. In addition, the jury was properly instructed on the purposes for which it could consider her testimony. (*Kipp,* at p. 372.)

In sum, the trial court did not abuse its discretion in admitting Harvey's testimony.

### 4. *Denial of motion for judgment of acquittal*

At the end of the prosecution's case-in-chief, defendant unsuccessfully moved for acquittal on the attempted murder, residential burglary, and robbery counts stemming from the attack on Ruth Durham. (§ 1118.1.)[22] Defendant contends the trial court erred in denying his motion in violation of his rights under the Fifth and Fourteenth Amendments to the federal Constitution and article I, sections 7 and 17 of the state Constitution. We disagree.

In making his motion, defense counsel stated, "As I recall the testimony on [those] count[s], Mrs. Durham was injured, did not know what happened, claimed the loss to be some sweaters, and the only evidence the prosecution has introduced . . . is Pat Armstrong believes she saw a person that she identified as the defendant . . . walking down the street. I think, as a matter of law, it takes more than having a person walking down the street during a gross approximation of the time of the offense to be sufficient to sustain a conviction. . . . [T]his man was not doing anything, was not perspiring, was not running, just an ordinary citizen walking down the street." The prosecutor responded, "[I]f you just take the Durham incident standing by itself, I would be in agreement with counsel." The prosecutor asserted, however, that the

---

[22] Section 1118.1 provides in relevant part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

common features between the Durham attack and the other charged crimes and uncharged conduct were "almost like a fingerprint." The trial court denied the motion.

 " 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review." (*People v. Stevens* (2007) 41 Cal.4th 182, 200 [59 Cal.Rptr.3d 196, 158 P.3d 763].)

Here, as recounted above, at the time defendant's motion was made, the prosecution had introduced evidence that all of the victims in the charged crimes were elderly Caucasian women who were attacked in their homes, and that all of the attacks occurred within a two-month period in the neighboring communities of Hayward and San Leandro. Durham, Figuerido, Constantin, and Herrick were attacked during the day, and there was evidence from which a jury could reasonably infer Larson's death also occurred during the day. Three of the victims lived in corner homes; Durham lived next to, and had regular access to, her daughter's corner home; and Figuerido's home was separated from the next building on the left by an empty half-acre lot. All of the victims suffered blunt trauma to the head, and either were robbed or robbery was attempted. Defendant was identified at or near the victim's home for each incident, and in the case of Constantin, he sold jewelry belonging to Vickie Constantin the same afternoon her mother was attacked, and gave away more jewelry taken from that residence to an acquaintance several days later. Moreover, at the time of defendant's motion, the prosecution had introduced evidence of the incident involving Lavinia Harvey, an elderly Caucasian woman who lived in a corner house. This incident also occurred during the day, and during the same two months and in the same geographic area as the charged crimes. Harvey identified defendant as the individual she encountered on her property. This evidence collectively supported a prima facie case that defendant was the perpetrator in the Durham incident.

### 5. *Asserted prosecutorial misconduct*

During his closing argument, the prosecutor said, "Isn't it strange that after Mr. Lynch fled our county, there has been no other cases—" Defense counsel objected. Before the court ruled on the objection, the prosecutor continued, "—not one scintilla of evidence—" The court said, "Just a moment. Limit yourself to the evidence, Mr. Anderson. Please move on. Thank you." The prosecutor turned to a different topic.

 "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711 [94 Cal.Rptr.3d 699, 208 P.3d 634] (*Avila*).) Even assuming the prosecutor here ran afoul of the prohibition against referring to evidence outside the record, no prejudice is apparent under any standard. The court immediately admonished the prosecutor, and the jury had been instructed at the beginning of trial to "[p]lease remember that what the attorneys say is not evidence." Likewise, later on the same day that the prosecutor made his challenged comment, the court again instructed the jury, "Statements made by the attorneys during the trial are not evidence . . . ." We presume the jury followed these instructions. (*Id.* at p. 719.)

### 6. *Asserted instructional error*

#### (a) *Refusal to give special instruction*

Defendant contends the trial court erred in declining to instruct the jury in the language of his proposed special instruction in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, and 15 to 17 of the state Constitution. Not so.

The trial court instructed the jury in the language of CALJIC No. 17.02: "Each count charges a distinct crime. You must decide each count separately. The defendant may be found guilty or not guilty of any or all of the crimes charged. Your finding as to each count must be stated in a separate verdict." The trial court refused to give defendant's proposed instruction that stated: "Each count charges a distinct crime. You must decide each count separately. The defendant may be found guilty or not guilty of any or all of the crimes charged, but your consideration of the evidence as to one count should not be influenced by the fact that other counts have been charged. For any count which has not on its own and independently of other charges been proven beyond a reasonable doubt you must find the defendant not guilty." The court stated that the topic was "adequately covered by 17.02," and the proposed instruction "could be confusing."

This ruling was correct. We have previously concluded a trial court properly refused to give a similar proposed instruction when the evidence, as in this case, was cross-admissible, and the jury was instructed in the language of CALJIC No. 17.02. (*People v. Catlin* (2001) 26 Cal.4th 81, 153 [109 Cal.Rptr.2d 31, 26 P.3d 357]; see *People v. Geier* (2007) 41 Cal.4th 555, 578–579 [61 Cal.Rptr.3d 580, 161 P.3d 104].) Moreover, here, as noted above, the jury clearly did consider each crime separately, because it acquitted defendant of the attempted murders of Durham and Herrick, and the robbery of Larson.

### (b) *Instructing on consciousness of guilt*

Defendant contends the trial court erred in instructing the jury in the language of CALJIC Nos. 2.03 (willfully false or misleading statements), 2.06 (attempt to suppress evidence), and 2.52 (flight) in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, and 15 to 17 of the state Constitution. We have repeatedly rejected the claims that these instructions are partisan and argumentative, permit the jury to irrationally infer guilt, or undermine the reasonable doubt requirement. (*Friend, supra,* 47 Cal.4th at pp. 52–53 [rejecting arguments that CALJIC Nos. 2.06 and 2.52 are argumentative and allow the jury to draw irrational inferences]; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 221 [79 Cal.Rptr.3d 125, 186 P.3d 496] [rejecting argument that CALJIC No. 2.03 violated the defendant's right "not to be convicted of a crime on a standard of less than beyond a reasonable doubt"]; *People v. Kelly* (2007) 42 Cal.4th 763, 792 [68 Cal.Rptr.3d 531, 171 P.3d 548] [CALJIC No. 2.52 does not impermissibly undermine and dilute the requirement of proof beyond a reasonable doubt]; *Zambrano, supra,* 41 Cal.4th at p. 1159 [rejecting argument that CALJIC No. 2.06 "diluted the presumption of innocence, reduced the prosecution's burden of proof, and created a mandatory conclusive presumption of guilt"]; *People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190] [rejecting claim that CALJIC No. 2.03 is "impermissibly argumentative and improperly allowed the jury to make irrational inferences regarding his mental state during the commission of the offenses"].) Defendant offers no persuasive reason for us to reconsider these conclusions.

### 7. *Refusal to strike robbery-murder special-circumstance allegation*

The jury found defendant guilty of the murder of Pearl Larson and the burglary of her home, predicated on entry with intent to commit theft,[23] and found true the robbery-murder and burglary-murder special-circumstance allegations. It found defendant not guilty of robbery. Following this verdict, defendant moved to strike the robbery-murder special-circumstance finding on the ground that it was inconsistent with the jury's not guilty verdict on robbery.[24] The trial court denied the motion, stating, "it could well be that the jury decided there was an attempted robbery rather than a robbery, which would be consistent with the finding of the special circumstance, even though they found the defendant not guilty of the robbery." Defendant contends the trial court's failure to strike the robbery-murder special-circumstance finding violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Not so.

The jury was instructed here that to find the robbery-murder special-circumstance allegation true, it must be proved: "That the murder was committed while the defendant was engaged in the commission or attempted commission of a robbery; or the murder was committed during the immediate flight after the commission or attempted commission of a robbery by the defendant; and the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder." There was evidence that the skin on Larson's left ring finger was significantly abraded and bruised around her ring. In addition, the credit card holder portion of a wallet and some coins were lying on the bed next to Larson. From this evidence the jury reasonably could have inferred that defendant unsuccessfully attempted to remove the ring or other personal property and killed Larson while engaged in this attempt.

---

[23] The jury was instructed that "[e]very person who enters any building with the specific intent to steal, take and carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of such property, is guilty of the crime of burglary in violation of section 459. It is immaterial whether the intent with which the entry was made was thereafter carried out. In order to prove such crime, each of the following elements must be proved: 1) A person entered the building; 2) At the time of entry, such person had the specific intent to steal and take away somebody else's property, and intended to deprive the owner permanently of such property."

[24] Defendant's crimes were committed in 1987, and hence section 1385.1, which was adopted in 1990 and precludes a trial court from striking or dismissing a special circumstance found true by the jury, is inapplicable. (*Ledesma, supra*, 39 Cal.4th at p. 745, fn. 29.)

Defendant contends, however, that because the jury was never instructed in the language of CALJIC No. 6.00,[25] which defines attempt, it had "no basis upon which to make a determination as to whether there had been an attempted robbery." He contends that the word "attempt" in our jurisprudence "embodies long-recognized principles that go well beyond a simple dictionary definition of the word 'attempt.' "

Even assuming the trial court was required to instruct the jury on the definition of attempt with respect to the robbery-murder special-circumstance allegation, any error was harmless beyond a reasonable doubt. (*People v. Prieto* (2003) 30 Cal.4th 226, 256–257 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Cain* (1995) 10 Cal.4th 1, 44 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) As noted above, the robbery-murder special-circumstance allegation required the jury to find that "the murder was committed while the defendant was engaged in the commission or attempted commission of a robbery." In *Cain*, the trial court did not instruct on the definition of attempt, and the jury found the defendant not guilty of rape, but found true an attempted rape-murder special-circumstance allegation. (*Cain*, at p. 44.) We concluded that CALJIC No. 6.00 "merely restates the common meaning of 'attempt,' " which is "to 'try' or 'endeavor to do or perform' the act." (*Cain*, at p. 44.) Here, as in *Cain*, defendant could not "try" to rob Larson without intending to do so and doing an act towards the robbery's commission. (*Ibid.*) Indeed, in convicting defendant of burglary, the jury found he entered Larson's home with a "specific intent to steal." Thus, in finding defendant attempted or tried to rob Larson, "the jury . . . necessarily considered and found to be true the elements set forth in CALJIC No. 6.00." (*Ibid.*) Moreover, the jury was instructed on the definition of "attempt" with respect to attempted murder. "Under these circumstances, we conclude omission of the attempt instruction did not contribute to the verdict obtained; the jury necessarily made the requisite findings necessary to hold defendant liable for this special circumstance." (*Ibid.*)

■ For these reasons, we reject defendant's further contention that even if the jury found Larson's murder was committed while defendant was

---

[25] CALJIC No. 6.00 provides: "An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission. [¶] In determining whether this act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the offense or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt. However, acts of a person who intends to commit a crime will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to commit that specific crime. These acts must be an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design."

engaged in the attempted commission of robbery, the murder could not have been committed to "carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection" within the meaning of the special circumstance instruction. Defendant claims that because this portion of the instruction refers only to robbery, it does not apply to the attempted commission of robbery. This assertion is meritless. When one attempts to commit robbery, one by definition " 'advance[s] the commission of the crime of robbery' " within the meaning of the special circumstance. (*Stanley, supra*, 39 Cal.4th at p. 956 [observing that this clarifying clause of the special circumstance instruction explains to the jury that in order for the "special circumstance to apply, the murder must be committed while the defendant was engaged in robbery or attempted robbery"].)

Defendant also contends that the burglary conviction must be reversed, and the burglary-murder special circumstance vacated, because they are supported by insufficient evidence. In order to convict him of burglary, defendant argues the jury was required to find that he entered with the intent to steal, and "[t]here was no such evidence." Nor, for this same reason, he contends, is there evidence to support the special circumstance allegation that the "murder was committed while the defendant was engaged in the commission or attempted commission of a burglary." To the contrary, the jury reasonably could infer in light of the abrasions and bruising to Larson's ring finger, the presence of the credit card holder and coins adjacent to her body, and "the modus operandi involved" in the other crimes, that defendant's "intent was, . . . in part, to commit theft." (*People v. Prince* (2007) 40 Cal.4th 1179, 1256 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

## C. *Penalty Phase Issues*

### 1. *Asserted instructional error*

#### (a) *Challenges to CALJIC No. 8.85*

Defendant asserts his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, section 7 of the state Constitution, were violated when the trial court instructed the jury in the language of CALJIC No. 8.85, reiterating section 190.3. We have repeatedly rejected similar arguments, and defendant offers no persuasive basis on which to revisit our conclusions.

 Thus, contrary to defendant's assertion, the trial court was not required to delete inapplicable mitigating factors from the instruction. (*People v. Watson* (2008) 43 Cal.4th 652, 701 [76 Cal.Rptr.3d 208, 182 P.3d 543].) Moreover, because the instruction was properly given, the prosecutor

was free to argue that certain mitigating factors did not apply to defendant. Use of the adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g), and reiterated in CALJIC No. 8.85, is constitutional. (*People v. Valencia* (2008) 43 Cal.4th 268, 311 [74 Cal.Rptr.3d 605, 180 P.3d 351].) Use of the phrase " 'at the time of the offense' in the list of potential mitigating factors does not impermissibly restrict the jury's consideration of evidence in mitigation or otherwise result in an arbitrary or capricious penalty determination." (*People v. Rundle* (2008) 43 Cal.4th 76, 198 [74 Cal.Rptr.3d 454, 180 P.3d 224].) Nor was the trial court required to instruct the jury that the "absence of a particular mitigating factor could not be weighed as an aggravating circumstance." (*People v. Jackson* (2009) 45 Cal.4th 662, 694–695 [88 Cal.Rptr.3d 558, 199 P.3d 1098].)

### (b) *Refusal to give defendant's special instruction*

Defendant contends the trial court erred in refusing to give his proposed instruction in violation of his rights under the Eighth and Fourteenth Amendments to the federal Constitution. Not so.

The proposed instruction provided: "If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty. [¶] A mitigating factor does not have to be proved beyond a reasonable doubt to be considered. You may find that a mitigating factor exists if there is any substantial evidence to support it. [¶] Moreover, the law does not require that you find the exist[e]nce of any mitigating fact before you choose life without the possibility of parole over death. You may find, even in the absence of mitigating evidence, that the aggravating evidence is not compar[a]tively substantial enough to warrant death."

The jury was instructed on the definition of aggravating and mitigating circumstances.[26] The jury was also instructed in the language of CALJIC No. 8.85, which allowed consideration of "[a]ny other circumstance which extenuates the gravity of the crime" and "any sympathetic or other aspect of the defendant's character or record." In addition, the jury was instructed that "sympathy and mercy for the defendant are proper considerations. If a

---

[26] The jury was instructed: "An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. . . . You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider."

mitigating circumstance or an aspect of the defendant's background or his character, as shown by the evidence, or your observation of the defendant, arouses sympathy or compassion such as to persuade you that death is not the appropriate penalty, you may act in response thereto and impose a punishment of life imprisonment without the possibility of parole on that basis." Thus, the proposed defense instruction was properly refused to the extent it duplicated other instructions given. (*People v. Gurule* (2002) 28 Cal.4th 557, 659 [123 Cal.Rptr.2d 345, 51 P.3d 224].) ■■■ "Moreover, a trial court is not required to instruct the jury that mitigating evidence need not be proved beyond a reasonable doubt." (*Avila, supra*, 46 Cal.4th at p. 722.) Nor must it instruct the jury that it may return a sentence of life imprisonment without the possibility of parole even in the absence of mitigating evidence. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 52 [82 Cal.Rptr.3d 323, 190 P.3d 664].)

## 2. *Constitutionality of California's death penalty statute*

Defendant contends that California's death penalty statute is constitutionally invalid in numerous respects. We have repeatedly rejected similar claims, and do so again here.

■■■ "[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813 [95 Cal.Rptr.3d 78, 209 P.3d 1] (*Dykes*).) We further "reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976, 978 [129 L.Ed.2d 750, 114 S.Ct. 2630].)

Contrary to defendant's assertion, the death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing or deprive defendant of the right to a jury trial, because it does not require written findings, unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. (*Dykes, supra*, 46 Cal.4th at p. 814; *Avila, supra*, 46 Cal.4th at p. 724.) The jury may properly consider a defendant's unadjudicated criminal activity. (*People v. Martinez* (2010) 47 Cal.4th 911, 968 [105 Cal.Rptr.3d 131, 224 P.3d 877].) Nor, contrary to defendant's alternative claims, is a preponderance of the evidence standard of proof compelled for the findings that an aggravating factor exists, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate sentence, nor is the trial court required to instruct the jury that there is no burden of proof. (*People v. Taylor* (2009) 47 Cal.4th 850, 899 [102 Cal.Rptr.3d 852, 220 P.3d 872]; *Avila, supra*, 46 Cal.4th at p. 724; see *Tuilaepa v. California, supra*, 512 U.S. at p. 979.)

"The failure to require intercase proportionality does not guarantee 'arbitrary, discriminatory, or disproportionate impositions of the death penalty,' or violate the Fifth, Sixth, Eighth, and Fourteenth Amendments." (*People v. Stevens, supra*, 41 Cal.4th at p. 212.) Moreover, "capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law." (*People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614].)

### 3. *Asserted violation of international law*

Defendant contends that his death sentence violates international law and therefore his rights under the Eighth and Fourteenth Amendments to the federal Constitution. Defendant points to no authority that "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

### 4. *Effect of any reversal of convictions or special circumstance findings*

Defendant contends that if any of his convictions are reversed, or special circumstance findings vacated, his death judgment must be reversed. We have neither reversed any convictions nor vacated any special circumstances.

### 5. *Asserted cumulative error*

Defendant contends that cumulative guilt and penalty phase error requires reversal. Where we have found or assumed error, we have found no prejudice, nor do we discern cumulative prejudice.

## III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**MORENO, J.,** Dissenting.—In this death penalty case, the majority concludes that the trial court properly denied defendant's motions for self-representation made pursuant to *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*), because the motions were untimely. I disagree. In *Faretta*, the high court explained that it was error to deny the defendant's otherwise valid motion for self-representation made "weeks

before trial." (*Id.* at p. 835.) We have explained that "in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial." (*People v. Windham* (1977) 19 Cal.3d 121, 127–128 [137 Cal.Rptr. 8, 560 P.2d 1187], fn. omitted (*Windham*).) "Erroneous denial of a *Faretta* motion is reversible per se. (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 177, fn. 8 [79 L.Ed.2d 122, 104 S.Ct. 944].)" (*People v. Dent* (2003) 30 Cal.4th 213, 217 [132 Cal.Rptr.2d 527, 65 P.3d 1286] (*Dent*).) Defendant made his initial *Faretta* motion roughly four weeks before pretrial motions were scheduled to begin, and over one month before pretrial motions actually began. The determination of whether a *Faretta* motion is timely should depend, not upon a totality of the circumstances as the majority suggests, but upon the only relevant factor—time. Because defendant's *Faretta* motions were otherwise proper, and because they were made "weeks before trial," as in *Faretta*, the trial court erred by denying the motions as untimely. This error mandates reversal; accordingly, I dissent.

I briefly review the pertinent facts to highlight the relevant timeline. Defendant appeared for arraignment in October 1987. Defendant's preliminary examination spanned an eight-month period, ultimately concluding in August 1988. Defendant remained incarcerated for the next three years while numerous continuances were granted. As defendant explained, this delay was due both to his counsel being "busy with other cases, with other clients," as well as the district attorney being "tied up." Finally frustrated with the slow progression of his case, and troubled by his lack of participation in his defense, defendant sought to substitute counsel. Failing at this endeavor, defendant decided to represent himself.

As the majority acknowledges, defendant's initial *Faretta* request was not made for dilatory purposes. Defendant had not made numerous such requests, or requests to substitute counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], during the four-year period he spent awaiting trial. (See maj. opn., *ante*, at p. 727 ["the nearly four-year delay in this case cannot be attributed to defendant"].) It is also undisputed that defendant's request was unequivocal. Nonetheless, defendant's motion was denied on timeliness grounds. Certain that the trial court's decision was erroneous, defendant renewed his motion for self-representation, and the trial court again denied the motion on grounds of timeliness.

*Faretta* explains that a defendant possesses the right to conduct his or her own defense provided that he or she knowingly, voluntarily, intelligently, and unequivocally asserts that right in a timely fashion, and is not acting with the purpose of delay. (*Faretta, supra,* 422 U.S. at pp. 835–836; see also *Windham,*

*supra*, 19 Cal.3d at p. 128.) The high court has repeatedly affirmed a criminal defendant's right to waive counsel and proceed by way of self-representation. (See, e.g., *Indiana v. Edwards* (2008) 554 U.S. 164, 170–171 [171 L.Ed.2d 345, 128 S.Ct. 2379, 2383–2384] ["[t]he Court's foundational 'self-representation' case, *Faretta*, held that the Sixth and Fourteenth Amendments include a 'constitutional right to proceed *without* counsel when' a criminal defendant 'voluntarily and intelligently elects to do so.' 422 U.S. [at p.] 807 . . . (emphasis in original)"]; *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 150–151 [165 L.Ed.2d 409, 126 S.Ct. 2557] [holding that the trial court's erroneous deprivation of the defendant's 6th Amend. right to choice of counsel entitled him to reversal of his conviction]; *McKaskle v. Wiggins, supra*, 465 U.S. at p. 174 [holding that the United States Constitution "implies a right in the defendant to conduct his own defense"].)

Following the high court's decision in *Faretta*, we were called upon to examine whether a midtrial motion for self-representation was timely. (*Windham, supra*, 19 Cal.3d at p. 124.) We concluded that the right to self-representation was unconditional if asserted unequivocally, voluntarily, and intelligently "within a reasonable time prior to the commencement of trial." (*Id.* at p. 128.) Once trial commences, however, we concluded that it is within the "sound discretion of the court" to determine whether a defendant may proceed by way of self-representation. (*Ibid.*)

Here, it is undisputed that defendant's request to represent himself was knowing, voluntary, intelligent, unequivocal, and not made for the purpose of delay. The sole question for this court's consideration is whether defendant's motions for self-representation, made "weeks before trial" as in *Faretta*, were untimely. (*Faretta, supra*, 422 U.S. at p. 835.)

As the majority acknowledges, we have held that an otherwise proper *Faretta* motion made within a reasonable time prior to the commencement of trial must be granted. (Maj. opn., *ante*, at pp. 721–722; *Windham, supra*, 19 Cal.3d at p. 128.) The majority explains that "the high court has never delineated when a motion may be denied as untimely. Nor has this court fixed any definitive time before trial at which a motion for self-representation is considered untimely . . . ." (Maj. opn., *ante*, at p. 722.) The majority explains that there are two lines of cases, one of which concludes that *Faretta* motions made on the eve of or during trial are untimely, and the other of which explains that *Faretta* motions made days or weeks in advance of trial are unquestionably timely. From these two lines of cases, the majority draws the conclusion that "our refusal to identify a single point in time at which a self-representation motion filed before trial is untimely indicates that outside these two extreme time periods, pertinent considerations may extend beyond

a mere counting of the days between the motion and the scheduled trial date." (Maj. opn., *ante*, at p. 723.)

The majority's reasoning suffers from two flaws. First, and most significantly, the instant motions were made months before trial began, and therefore do not fall within the gray area between certainly untimely and certainly timely motions for self-representation. The majority cites two cases—*People v. Joseph* (1983) 34 Cal.3d 936, 944 [196 Cal.Rptr. 339, 671 P.2d 843] and *Dent, supra*, 30 Cal.4th at page 217—for the proposition that *Faretta* motions made days or months before the commencement of trial are timely. Although the majority endeavors to distinguish this authority as examples of undeniably timely *Faretta* motions, the cases share striking similarity to the one at bar. In *Dent*, the defendant's *Faretta* motion was made on the day trial had been scheduled to begin, but was continued through no fault of the defendant's. (*Dent, supra*, 30 Cal.4th at pp. 215–216.) We concluded that "since no trial was imminent, and did not in fact occur for over four months, the motion appears timely." (*Dent, supra*, 30 Cal.4th at p. 221.) In *Joseph*, we held that "[t]he record establishes that appellant's *Faretta* motion was timely proffered. The request was made some five months before trial and almost two months before any pretrial motions were heard." (*Joseph, supra*, 34 Cal.3d at p. 944.) Similarly, here, defendant's *Faretta* motions were made weeks before pretrial motions began and nearly five months before the jury was empanelled. We concluded in *Joseph* that because "an unequivocal assertion of appellant's desire to proceed *pro se* was made well in advance of trial . . . the denial of that motion constituted error. Since the erroneous denial of a timely proffered *Faretta* motion is reversible per se, the judgment of conviction must be set aside." (*Joseph, supra*, 34 Cal.3d at p. 939.) That same result is compelled here.

The second flaw with the majority's reasoning is its conclusion that factors other than time may be considered when determining whether a *Faretta* motion is timely. The majority explains that a court should consider "not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, . . . the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (Maj. opn., *ante*, at p. 726.) As support for its position, the majority points out the potential pitfalls associated with the Ninth Circuit's view that a *Faretta* motion made any time prior to the commencement of trial is timely (see, e.g., *Marshall v. Taylor* (9th Cir. 2005) 395 F.3d 1058, 1061, fn. 17; *Avila v. Roe* (9th Cir. 2002) 298 F.3d 750, 753 [*Faretta* request is timely if made before jury empanelment unless it is shown to be a tactic to secure delay]; *Savage v. Estelle* (9th Cir. 1990) 924 F.2d 1459, 1463, fn. 7 [a *Faretta* motion made one week prior to commencement of voir dire was timely]; accord, *Armant v. Marquez*

(9th Cir. 1985) 772 F.2d 552, 555)—suggesting that the Ninth Circuit approach is myopic because "nothing in *Faretta* or its progeny either expressly or implicitly precludes consideration of factors other than the number of weeks between the self-representation motion and the trial in determining timeliness in this more complex and serious scenario [of a capital case]." (Maj. opn., *ante*, at p. 725.)

This case does not demand a new test be developed to ascertain the timeliness of a *Faretta* motion. We need not articulate a bright-line test consistent with the Ninth Circuit's that a *Faretta* motion made even one day prior to commencement of trial is timely. Here, defendant's motions were made weeks before pretrial proceedings began, and months prior to jury empanelment. But just as we need not develop a bright-line test, we are also not called upon here to go beyond our holding in *Windham* that an otherwise proper *Faretta* motion must be granted if made "within a *reasonable time* prior to the commencement of trial." (*Windham, supra,* 19 Cal.3d at p. 128, italics added.) Indeed, we noted that our "reasonable time" requirement should "not be used as a means of limiting a defendant's constitutional right of self-representation," but rather to limit a defendant's ability to cause delay or obstruct the orderly administration of justice. (*Id.* at p. 128, fn. 5, italics omitted.)

Ignoring this admonition, the majority adopts a test for timeliness that examines the time between a defendant's *Faretta* motion and the commencement of trial, as well as trial counsel's readiness, witness availability, and other pretrial proceedings. In *Windham,* we crafted a test to determine whether a trial court should exercise its discretion to grant a defendant's untimely motion for self-representation that addressed, among other factors, "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham, supra,* 19 Cal.3d at p. 128.) In the wake of this decision, trial courts will be placed in the confusing position of assessing similar factors to determine both whether a pretrial *Faretta* motion is timely, and whether a midtrial, *untimely,* *Faretta* motion should be granted.

To reach this result, the majority relies on our decisions in *People v. Hamilton* (1985) 41 Cal.3d 408, 419–420 [221 Cal.Rptr. 902, 710 P.2d 981] (*Hamilton I*) and the decision subsequently affirming it, *People v. Hamilton* (1988) 45 Cal.3d 351 [247 Cal.Rptr. 31, 753 P.2d 1109] (*Hamilton II*) (collectively, *Hamilton*), in which we concluded that a *Faretta* motion made about one month before trial, but in the midst of an extensive Penal Code sections 1538.5 and 995 hearing, was " 'untimely within the context of this

protracted . . . hearing,' and the trial court acted within its discretion in denying it. ([*Hamilton II*,] at p. 363, incorporating *Hamilton I*, at p. 420.) Thus, in *Hamilton II*, we concluded that the defendant's pretrial self-representation motion, made about a month before trial, was untimely in light of the surrounding circumstances." (Maj. opn., *ante*, at p. 724.)

The majority's reliance upon *Hamilton* is misplaced. *Hamilton* addressed the unique circumstance of how to treat a defendant's *Faretta* motion made during a protracted (in that case, two-month-long) pretrial hearing. We concluded that such a motion should be treated as an untimely midtrial motion, and the *Windham* factors should be applied. In so doing, we concluded that "the court properly exercised its discretion under *Windham* in denying the motion on the ground that defendant had not stated a valid reason for relieving counsel and was grasping at anything to delay the proceedings." (*Hamilton I, supra*, 41 Cal.3d at p. 420.) Here, in contrast, no protracted hearing complicated the assessment of whether defendant's *Faretta* motion was timely, and the majority acknowledges that the motion was not made for purposes of delay. *Hamilton* is inapt, and does not compel or support the adoption of a totality of the circumstances test to assess the timeliness of a *Faretta* motion.

Even assuming, arguendo, that a totality of the circumstances test ought to be conducted, it is not clear to me that the trial court properly denied the motion in light of all of the circumstances. The majority acknowledges that although the litigation had been proceeding for approximately four years at the time defendant made his *Faretta* motions, the delay was not defendant's fault. (Maj. opn., *ante*, at p. 727.) The majority suggests that defendant does "not thereby escape any responsibility for timely invoking his right to self-representation" (*ibid.*), suggesting a proper factor for the court to consider is whether defendant could have but did not make a self-representation motion earlier in the proceeding (maj. opn., *ante*, at pp. 726, 727). The majority further contends that the complexity of the issues, the age of witnesses, the potential for further delays, and the readiness of the parties support the trial court's denial of the motion. (Maj. opn., *ante*, at pp. 727–728.) An examination of each of these concerns suggests that they are not, individually or collectively, sufficient to deny defendant's constitutional right to represent himself.

Complexity of the issues is ever present in a capital proceeding, but this court has unambiguously concluded that the right to self-representation attaches even in such cases. (See *People v. Stansbury* (1993) 4 Cal.4th 1017, 1062 [17 Cal.Rptr.2d 174, 846 P.2d 756]; *People v. Bloom* (1989) 48 Cal.3d 1194, 1223 [259 Cal.Rptr. 669, 774 P.2d 698]; *People v. Teron* (1979) 23

Cal.3d 103, 113 [151 Cal.Rptr. 633, 588 P.2d 773].) Indeed, in our recent decision in *People v. Butler* (2009) 47 Cal.4th 814, 827 [102 Cal.Rptr.3d 56, 219 P.3d 982], we acknowledged the obstacle presented by the defendant's numerous disciplinary infractions while incarcerated, which limited his ability to fully research his defense. The trial court revoked his pro se status shortly before the beginning of trial, and we concluded that this revocation was erroneous. (*Ibid.*) We explained that, while the trial court may have reasoned that it did not make sense to allow the defendant to proceed by way of self-representation because his ability to research and investigate his defense was limited, the trial court's decision was nonetheless "inconsistent with the requirements of *Faretta* and its progeny" and was therefore erroneous. (*Id.* at p. 828.) Here, defendant faces no similar limitation with respect to his ability to conduct his own defense, and the fact that his case is a capital one is certainly not a sufficient justification for denying his Sixth Amendment right to self-representation.

The age of the witnesses is irrelevant to a consideration of the propriety of a motion for self-representation, particularly where, as here, the testimony of the elderly witnesses had been videotaped at defendant's preliminary hearing. To the extent that witnesses available in October 1991 might not later be able to provide live testimony, such a consideration should not weigh against granting a *Faretta* motion. Although live testimony is certainly preferred, it is not the case here, where the testimony has been preserved, that the evidence provided by those witnesses would be lost. Moreover, four years passed between defendant's arraignment and the commencement of trial, and numerous continuances were granted at the behest of both defense counsel and the district attorney; if age and availability of witnesses constituted an overriding concern, this delay should not have been tolerated. It should not now justify the denial of defendant's timely invocation of his right to self-representation, particularly where it is unclear that defendant's exercise of that right would have caused any further delay or otherwise impacted the ability of the witnesses to testify.

The potential for delay is another factor cited by the majority in support of its conclusion that a trial court may apply a totality of the circumstances test to determine whether a pretrial *Faretta* motion is timely. (Maj. opn., *ante*, at p. 728.) The majority places weight on the fact that defendant replied "Yeah" and "not sure" when asked by the court whether he was "talking about months" of time needed to prepare his case for trial. The majority indicates that a trial court may properly consider whether further delay will be caused in determining whether the invocation of the right to self-representation is timely, explaining that "[t]he reasonable import of [defendant's] comments is

that if the self-representation motion had been granted, defendant would have required an undetermined amount of time to investigate and prepare for trial." (*Ibid.*)

The majority's reasoning is deficient in two respects. First, it conflates two separate, independent grounds for denying a *Faretta* motion—whether the motion was timely and whether it was made for dilatory purposes. As the majority notes, "a *Faretta* motion may be denied if . . . the motion is made for purpose of delay." (Maj. opn., *ante*, at pp. 721–722, citing *People v. Marshall* (1997) 15 Cal.4th 1, 23 [61 Cal.Rptr.2d 84, 931 P.2d 262].) Thus, the majority is correct that a trial court may assess the potential for delay in deciding whether to deny a *Faretta* motion because it was made for a dilatory purpose, but it may not make that assessment under the guise of determining whether a *Faretta* motion is timely. We are mindful of the high court's concern that "[t]rial judges necessarily require a great deal of latitude in scheduling trials" (*Morris v. Slappy* (1983) 461 U.S. 1, 11 [75 L.Ed.2d 610, 103 S.Ct. 1610]; see maj. opn., *ante*, at p. 728), but that concern is better addressed by an analysis of whether a *Faretta* motion is made for dilatory purposes, not whether it is timely.

Second, even if the trial court properly could have assessed the potential for delay in evaluating the timeliness of defendant's *Faretta* motion, it is not clear in this case that delay would have resulted had the trial court granted defendant's motion. The majority does not dispute that defendant did not seek a continuance in conjunction with his *Faretta* motion. When asked by the court whether one would be necessary, and if so for how long, defendant indicated that he was "not sure." Although the court expressed concern that defendant might require a continuance to prepare for trial, defendant never raised this concern. Moreover, defense counsel and the prosecution could have—and did—request necessary continuances in the course of preparing for trial; there is no principled reason why a self-represented defendant should be denied that same privilege.

The majority places weight on the fact that defendant's initial *Faretta* hearing occurred on October 7, 1991, and pretrial motions could have begun as early as October 21, 1991, apparently suggesting that defendant may not have had sufficient time to prepare his case. Although the majority correctly points out that "defendant did not dispute that he would need time to investigate and prepare" (maj. opn., *ante*, at p. 728), the majority fails to persuade me that needing such time would have required continuances. In fact, pretrial motions did not commence until October 31, 1991—several weeks after defendant's hearing and over one month after defendant made his

initial request to represent himself. The motions took weeks to complete, and jury selection began in early December and did not conclude until mid-February 1992. In light of the prosecution's initial estimate that its guilt phase case would take between three and four weeks to complete, defendant could have expected he would have several months to prepare his case without needing to request a single continuance. Indeed, between the time defendant made his first *Faretta* request on September 27, and the time the prosecution completed its case, over five months had elapsed—which might well have been ample time for defendant to have prepared his case without needing to request a single continuance. Assuming that a trial court may consider the potential for delay in assessing the timeliness of a *Faretta* motion, it is not clear here that delay would have resulted had the trial court granted defendant's request to represent himself.

Finally, the readiness of counsel and defendant's apparent lack of justification for requesting self-representation do not validate the denial of defendant's motion. The test for self-representation is not whether invocation of the right is reasonable or logical (which it arguably is not in a case such as this where counsel spent weeks reviewing voluminous files), but whether denial of the motion is "inconsistent with the requirements of *Faretta* and its progeny." (*People v. Butler, supra*, 47 Cal.4th at p. 828.) "The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' *Illinois v. Allen* [(1970)] 397 U.S. 337, 350–351 [25 L.Ed.2d 353, 90 S.Ct. 1057] (Brennan, J., concurring)." (*Faretta, supra*, 422 U.S. at p. 834.) Regardless of counsel's readiness and defendant's poor or excellent reasons for wishing to invoke his right to provide his own representation, so long as the right is invoked voluntarily, intelligently, knowingly, unequivocally, in a timely fashion, and without the purpose of causing delay, a trial court lacks discretion to deny it. (*Id.* at p. 836.)

I see no reason to stray from our long-standing rule that "in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial. Accordingly, when a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be. Furthermore, the defendant's 'technical legal

knowledge' is irrelevant to the court's assessment of the defendant's knowing exercise of the right to defend himself." (*Windham, supra*, 19 Cal.3d at pp. 127–128, fn. omitted.) Defendant's motions here were timely under any formulation; accordingly, I believe that the trial court erred by failing to grant defendant's motions for self-representation, mandating reversal.

Appellant's petition for a rehearing was denied October 27, 2010. Corrigan, J., did not participate therein.